Filed 10/8/13  Wise v. DLA Piper CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DENNIS WISE et al., | D062150, D062661 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2010-00090600-CU-PN-CTL) |
| DLA PIPER LLP (US), | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Frederick L. Link, Judge.  Reversed.

Law Offices of Martin N. Buchanan, Martin N. Buchanan; Coughlan, Semmer, Fitch & Pott, R. J. Coughlan, Jr., and Cathleen G. Fitch for Defendant and Appellant.

Wolfe Legal Group, Deborah A. Wolfe and Lann G. McIntyre for Plaintiffs and Respondents.

Dennis Wise and Joan Macfarlane (together the Wises) were represented by the law firm, defendant DLA Piper LLC (US),[1] that aided them in obtaining a judgment in 1994 against William Cheng.  However, DLA did not advise the Wises of the necessity to renew the judgment, and after 2004 the judgment became unenforceable.  The Wises brought this action alleging malpractice and obtained a judgment against DLA.  On appeal, DLA contends the evidence is insufficient to support the judgment against it because there was no evidence the Wises' judgment against Cheng would have been collectable even had it been renewed.  DLA also contends on appeal (1) there was no substantial evidence the statute of limitations on the malpractice claim had been tolled by continuous representation, (2) the special verdict form was fatally flawed because it did not submit to the jury the issue of whether there had been continuous representation within four years of filing the complaint, and (3) even assuming the judgment as to liability and damages was proper, there was no legal basis for the award of attorney fees against DLA.  We do not reach these contentions because of our conclusion that there was no substantial evidence the judgment against Cheng was collectable.

---

[1]     During the relevant time, the Wises were represented by the law firm known as Gray, Cary, Ames & Frye, and later known as Gray Cary Ames & Friedenrich.  DLA Piper LLC (US) is the successor in interest to that firm.  For ease of reference, we refer to the firm as DLA regardless of time frame.

# I

# FACTUAL BACKGROUND

A. <u>DLA's Representation of the Wises in the Cheng Matter</u>

In 1987, the Wises loaned $350,000 to Cheng, who signed two promissory notes. However, Cheng defaulted on the notes, and later filed for bankruptcy.

The Wises retained their attorney, Robert Copeland, for assistance. Copeland, a DLA attorney, referred the matter to Mr. Breslauer (a fellow DLA attorney) to handle the bankruptcy issues. DLA filed a complaint in the bankruptcy court contesting the dischargeability of the debt owed by Cheng, alleging the loans were intended to be used for Cheng's business but Cheng had embezzled the money for his own use. The Wises and Cheng ultimately settled the complaint, with Cheng agreeing (1) to reaffirm the debt, (2) to commence making payments on the new obligation commencing in mid-1994, and (3) to stipulate that a judgment be entered against Cheng in state court in the event he defaulted on his new payment obligations.

Cheng made no payments on the debt. Accordingly, DLA obtained a state court judgment against Cheng, entered on August 1, 1994, for $605,184.50. DLA attorney Breslauer, who represented the Wises in obtaining the judgment, told them "we have got this judgment, it's good forever, until the cows come home." Breslauer also told the Wises "[w]e will keep our ears to the ground" and "we can come back and bring in Mr. Cheng for examinations from time to time, every six months, or surely once a year, if we want, just for harassment purposes even, if you want to." However, DLA did not inform the Wises the judgment would become invalid if not renewed within 10 years.

3

In 1994, DLA pursued collection efforts but determined Cheng was "dead broke," and a report from an asset search firm reported Cheng had no assets, had numerous other creditors, had been sued in numerous other proceedings, and had state and federal tax liens filed against him. Breslauer sent the asset search report to the Wises, and stated that if they were aware of any banking relationships not reflected in the report, they should contact Breslauer and DLA would "follow up." The Wises did not ask DLA to do anything further to collect the judgment, because there was nothing else to do unless something new came up.

Copeland left DLA in mid-1995 and took some of the Wises' matters with him to his new firm. However, the Wises instructed that the Cheng bankruptcy issues were to remain with Breslauer at DLA. When Breslauer left DLA at the end of 1995, the Cheng bankruptcy matters apparently remained with DLA, because DLA attorney Rubin wrote to the Wises in April 1996 explaining the status of the Cheng bankruptcy and told them they would receive a final distribution check later in the year, and that the "remainder of your judgment will survive this bankruptcy and is enforceable against Cheng's post-bankruptcy assets." Rubin stated she would "continue to monitor this case" but told the Wises "it is likely you will not receive any further notices except the one to allow the creditor distribution."

In late 1996, DLA attorney Zander sent a letter to the Wises enclosing a check from the bankruptcy trustee for $21,578.63, "representing the final distribution on your claim in the [Cheng] bankruptcy case." DLA sent no further bills to the Wises on the Cheng matter, although Rubin did send another letter to them in March 1998 that

4

enclosed a small check from the bankruptcy trustee and stated "[a]pparently, this is the final distribution. . . . Give me a call if there is anything else we can do for you."

The Wises had no further contact with DLA until 2009. Although DLA closed the Cheng file administratively, DLA did not notify the Wises it had ceased representing them.

B. Subsequent Events

The Wises divorced in 1998. When dividing their marital assets, they contacted Copeland at his new firm to help accomplish the division and assignment of the Cheng judgment, with each receiving one-half. Copeland's new firm appeared as counsel of record for the Wises in the state court lawsuit in which the judgment against Cheng had been obtained and accomplished the division and assignment later in 1998. Copeland did not advise the Wises of the need to renew the judgment within 10 years.

In 2004, the judgment expired as a matter of law. At trial, DLA stipulated its representation of the Wises fell below the standard of care because it did not inform them of the need to renew the judgment or calendar the 10-year expiration date on the judgment. In 2009, the Wises discovered the judgment had been allowed to expire, and filed the present action against DLA within one year of that discovery.

C. Evidence of Collectability: Cheng's Postbankruptcy Financial Condition

At trial, Cheng testified he has not owned any bank accounts, real estate, or any other assets since his bankruptcy proceedings. He previously was licensed as a CPA, but relinquished that license in the 1990's in part because he could not afford to pay for the

5

continuing education requirements. He had not filed a personal tax return in 17 years.[2]

Since his bankruptcy, the "only money" he has received to support his lifestyle was derived from three sources: (1) financial support from his parents (until they passed away six years before trial without leaving any estate to Cheng), (2) social security payments of approximately $2000 per month, and (3) funds from investors in corporations Cheng had formed. Cheng also testified that, for the foreseeable future, the only money he would have coming to him would be social security payments and proceeds from investors in the corporations. Although Cheng also stated he would be paid from "IBM sales," he testified he (1) had a nonexclusive arrangement to market IBM products and services and would be paid only *if* he sold an IBM product, (2) had no commitments from any customers to purchase IBM products, and (3) had been working with IBM for 20 years and had never been paid anything by IBM.

Cheng has a proven ability to convince investors to invest in corporate entities he has formed. Between 2003 and 2011, he raised at least $1.3 million from investors in OSCN and its subsidiaries, although Cheng estimated it was closer to $2 million. All of

_____

[2]     Although Cheng testified at his deposition he received $5000 per month from Cheng Consulting Services for his services, he denied that at trial. Instead, he testified that Overseas Chinese Net (OSCN), a Nevada corporation Cheng formed, in return for the services provided by Cheng Consulting Services to OSCN, used OSCN funds to pay the rent on the property Cheng occupies and that houses the office of Cheng Consulting Services and OSCN. OSCN is the sole source of the monthly funds for Cheng Consulting Services. Because OSCN and its subsidiaries apparently have never generated any revenue, it appears the source of funds was limited to money from investors into OSCN. Indeed, after testifying that his companies had "less than $100" in its accounts, Cheng was asked how he expected to pay the next month's expenses, and he responded he was "looking for investors," but "[n]o one has written a check yet."

6

these investment monies, in return for which the investors received stock in the entities, were paid into the corporations and were spent on operating expenses for the entities. The operating expenses paid for by funds invested in OCSN included the rent on the La Jolla house where Cheng lived, and his multiple trips to China. None of the funds were given to Cheng personally. By the time of trial, OSCN had less than $100 in its bank account. Cheng's biggest investor, Mr. White, had invested approximately $900,000 over the years and, although he had put other investors in contact with Cheng, he cautioned them they had to be willing to take a 100% risk on any funds invested. By the time of trial, White had written off most of his investments because "[t]here was no viable evidence that it was worth anything at that point," and White had told an investigator that "nothing has happened since the beginning of the stock, so I consider it worthless." Cheng agreed the stock was "worthless" and "could be used to wallpaper bathrooms."

Cheng testified that, "if any of these businesses . . . takes off and makes money," he would receive millions in back salary. However, none of the companies have any contracts or agreements, and Cheng described the companies as "dead" without an infusion of new investment funds. Since the stock market crash of 2008, Cheng has had difficulty raising money from investors. Cheng was specifically asked about solicitation materials he gave to a potential investor in 2009 seeking to persuade new investments in his companies. Cheng conceded the companies listed in those solicitation materials were dead, dormant, or had never even been formed. Until "2016 or thereabouts" the only money Cheng could count on receiving was from social security.

7

D. Expert Opinions on "Collectability"

*Plaintiff's Expert*

Joel Selik, a collection attorney, testified for the Wises that the Cheng judgment (1) could have been collected in the past and (2) might be collectable in the future. Selik premised his opinion on "past collectability" on several facts. First, Selik testified "it appears that Cheng had at least $2 million dollars, probably more since he gave a million to Ohio State," because Mr. White had invested approximately $900,000 so it was "absolutely uncontroverted that [Cheng] had money" that could have been reached by "piercing the corporate veil . . . and all that money we'd be able to collect," and piercing would have been "very easy in this particular case."

Second, Selik testified that although he had seen neither the deed to nor lease for the La Jolla home in which Cheng lived, there was "a probability" (based on the length of time Cheng had lived there and the amount of rent paid) he had an "ownership interest" in the home on which a creditor could levy. Third, Selik relied on Cheng's statement that he donated $1 million to his alma mater as indicative that Cheng had substantial assets after the bankruptcy, although Selik conceded he did not independently verify either the accuracy of Cheng's claim, or whether donations were made after (rather than before) Cheng's bankruptcy. Cheng, a 1967 graduate of Ohio State University, testified he donated over $1 million to the university "[o]ver the years," and had also raised significant funds for Ohio State. However, there was no evidence these funds were donated after the Wises' judgment had lapsed. Indeed, although Cheng received a "Pacesetter" award from Ohio State's Fisher College of Business, that award was

8

conferred in 1986, and Cheng testified he had left the board of an Ohio State alumni group after the bankruptcy.

Fourth, Selik relied on Cheng's testimony that he (Cheng) had made multiple trips to China after the bankruptcy as indicating he was "spending a lot of money." The only evidence for the funding of these trips was that Cheng used investor money for them, and Selik's testimony contained no mention of any factual basis for his belief that Cheng used personal resources for them. Indeed, Selik conceded he had not conducted an asset search on Cheng, but nevertheless stated (when asked how Cheng could have paid the judgment in response to pressure from his investors) that "[w]e have a few possible sources and a few out there in the [ether] that I suspect."

Fifth, Selik expressed the opinion that Cheng had money hidden in foreign bank accounts, although he conceded "we have no evidence of that." Finally, Selik believed a determined collections effort could have included subpoenas requiring Cheng's investors to appear at third-party debtor examinations, and these examinations would have induced the investors either to put pressure on Cheng to pay the judgment or, alternatively, to loan Cheng the money to pay the Wises.

On appeal, the Wises claim (without citation to the record) Cheng "testified that if he had been aggressively pursued, he would have come up with [enough money to fully] satisfy the judgment." We disregard this "testimony" in our analysis for several reasons. First, the Wises' malpractice claim was not that DLA should have aggressively pursued collection efforts *before* the judgment expired in late 2004, and therefore Cheng's

9

purported ability to raise funds to pay the judgment *before* that date has no relevance to whether the Wises showed the judgment would have been collectable had it not expired.

Second, Cheng's "what if" surmises are doubly speculative, because it asks him to speculate both as to what *he* would have done, and to how *others* would have reacted to what he might have done (cf. *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 780-781) and "speculation is not evidence, less still substantial evidence." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1081, disapproved on other grounds by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

Finally, and most importantly, Cheng did not *testify* he would have come up with enough money to fully satisfy the judgment had he been pursued after 2004. Instead, the Wises apparently refer to a declaration (not included in the record on appeal) prepared by their counsel and signed by Cheng that stated "I am certain that if I had asked, I could have and would have obtained stock equity investments from [OCSN investors] to satisfy the entire judgment . . . ." Cheng's actual *testimony*, however, was that by the time he signed the declaration he was not getting much money anymore from investors because of the recession. Moreover, when specifically asked about the statement that he would have obtained money from investors to pay the judgment, Cheng actually testified he "*wouldn't* ask my investors to take their money and . . . satisfy the judgment" (italics added), nor would he have "gotten anywhere with [such a request]," nor would he have used investments made in the corporations to pay the Wises because "[t]hat's what Ponzi schemes do."

10

Selik's opinion on "future collectability" was based on a single overarching theme: because Cheng had been able to convince some "very important men" to invest in his business proposals in the past, Cheng would likely be able to obtain investors in his new business schemes in the future. After describing the various business schemes being touted by Cheng as future avenues for investors,[3] Selik stated Cheng is either "the person to make them go or he is a scam artist [and] I don't know the answer to that question." Although Selik conceded "there are a lot of indices of scam artistry" by Cheng, Selik explained it made no difference to his opinion on future collectability "whether or not . . . Cheng is a scam artist or if he's for real," because "[i]f he's really going forward, then we might have something . . . in the millions and millions and millions to go after. If he's just a scam artist, it's probably just a few million dollars in investments that we will be going after." Specifically, Selik explained "[i]f he's scamming people for business deals, my obligation [as a collection attorney] is [to] the client. I will be there to get the money that he's scamming from somebody else."

*Defendant's Expert*

Miles Grant, a collection attorney, testified for DLA that the judgment could not have been collected in the past or in the future. Grant conducted an extensive investigation of Cheng's assets, which Selik described as "excellent," and determined that Cheng has "been broke" and has "never had any assets" since 1991. Cheng owns no bank

---

[3] Selik mentioned Cheng's "algae for oil" scheme, the "commodities and the trading money in gold," and Cheng's "Marco Polo" proposal. However, although Selik mentioned these future projects, he expressly disavowed that his opinions on "collectability" were reliant on any opinions as to "investment in China."

accounts in his name, drives a car--registered in the name of one of his companies-- against which debt is owed, and lives in a rental unit (in which he had no ownership interest) not in good condition and furnished with "quite old" furniture.

Grant explained that a primary theme of Selik's opinion regarding collectability--a creditor may use "reverse alter ego" to reach corporate assets to satisfy debts incurred by a shareholder of the corporate entity--is an incorrect theory because the theory is no longer available to creditors. Grant also testified Selik's theory that the creditor could have subpoenaed Cheng's investors for third-party debtor examinations and thereby pressured his investors to lend money to Cheng (or pressured Cheng to pay the judgment) faced numerous factual and legal obstacles: first, the identities of the investors would be unknown to the creditor unless Cheng cooperated with the creditor; second, many judges would not permit a creditor to subpoena third-party investors because of the statutory limitations on such subpoenas; finally, it is purely speculative that investors would then have given or loaned Cheng an additional $1 million with which to pay the judgment.

II

RELEVANT LEGAL PRINCIPLES

A. Substantive Law: The Issue of Collectability

"The elements of a cause of action in tort for professional negligence are: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." (*Budd v. Nixen* (1971) 6

12

Cal.3d 195, 200.) A showing of the last element of damage requires the plaintiff to prove that careful management of a lawsuit would have resulted in a favorable judgment *and collection thereof* because there is no damage in the absence of these latter elements. (*Campbell v. Magana* (1960) 184 Cal.App.2d 751, 754; accord, *DiPalma v. Seldman* (1994) 27 Cal.App.4th 1499, 1507 (*DiPalma*) [where alleged malpractice consists of mishandling a client's claim plaintiff must show proper prosecution would have resulted in favorable judgment and collection thereof].)

"The element of collectibility requires a showing of the debtor's solvency. ' ["W]here a claim is alleged to have been lost by an attorney's negligence, . . . to recover more than nominal damages it must be shown that it was a valid subsisting debt, *and that the debtor was solvent.*" [Citation.]' [Quoting *Lally v. Kuster* (1918) 177 Cal. 783, 788, italics added by *DiPalma*; citations.] The loss of a collectible judgment 'by definition means the lost opportunity to collect a money judgment from a solvent [defendant] and is certainly legally sufficient evidence of actual damage.' [Quoting *Jackson v. Johnson* (1992) 5 Cal.App.4th 1350, 1369, dis. opn. of Johnson, J.]" (*DiPalma, supra,* 27 Cal.App.4th at p. 1509.)

The plaintiff in a malpractice action must establish that the underlying judgment lost as the result of the attorney's error could have been collected. (*Garretson v. Harold I. Miller* (2002) 99 Cal.App.4th 563, 571.) As this court explained in *Hecht, Solberg, Robinson, Goldberg & Bagley, LLP v. Superior Court* (2006) 137 Cal.App.4th 579, 591:

> "Although such a plaintiff is not required to offer proof that
> establishes causation 'with absolute certainty,' a plaintiff is still
> required to ' " 'introduce evidence which affords a reasonable basis

13

for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result.' " [Citation.]' [Quoting *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1243.] . . . In this sense, collectibility of the hypothetical underlying judgment against the named defendant is a component of the plaintiff's current case relating to damages, as caused by the current negligent attorney defendant, and is a fact-intensive inquiry.

"It is useful to consider the various factors bearing upon the issue of collectibility of an underlying judgment, . . . to establish the proper guidelines for discovery. Collectibility is part of the plaintiff's case, and a component of the causation and damages showing, rather than an affirmative defense which the Attorney Defendants must demonstrate. [Citations.] Collectibility is not a question only of the solvency of the defendant in an underlying case, such as in bankruptcy, but rather pertains to the defendant's ability to pay a judgment or some part of it. [Citing 4 Mallen & Smith, Legal Malpractice (2006 ed.) § 30.17, pp. 490-491.] . . . . Collectibility thus 'looks to the actual circumstances to determine whether the judgment "would have been collectable." ' (*Id.* at p. 494, fn. 40.) *It is not enough for a plaintiff to present speculation or assumptions about an underlying defendant's ability to respond in damages, as opposed to proof of same.* [Citation.] Admissible evidence on collectibility can include information about the basic solvency of the defendant in the underlying case, as shown by its assets, net worth or available proceeds from investments." (Italics added.)

When the plaintiff does not introduce evidence from which a trier of fact could conclude, to a reasonable degree of certainty, the judgment would have been collectable, a verdict in favor of the plaintiff must be reversed. (*Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 166; accord, *Garretson v. Harold I. Miller, supra,* 99 Cal.App.4th at pp. 571-575 [affirming grant of JNOV where no evidence of collectability introduced].)

B. Standard of Appellate Review

On appeal, a jury's findings on collectability are reviewed for substantial evidence. (*Garretson v. Harold I. Miller, supra,* 99 Cal.App.4th at p. 569.) We review the evidence

14

most favorably to the findings, resolving all conflicts and indulging all inferences in support of the judgment. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) Although it is true that the testimony of a single witness, including the testimony of an expert, may be sufficient to constitute substantial evidence (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 487), when an expert bases his or her conclusion on factors that are "speculative, remote or conjectural," or on "assumptions . . . not supported by the record," the expert's opinion "cannot rise to the dignity of substantial evidence" and a judgment based solely on that opinion "must be reversed for lack of substantial evidence." (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135-1136 (*Pacific Gas*); accord, *Leslie G. v. Perry & Associates, supra*.) Similarly, "[a]n expert's opinion that assumes an incorrect legal theory cannot constitute substantial evidence." (*Corrales v. Corrales* (2011) 198 Cal.App.4th 221, 226 (*Corrales*).)

III

ANALYSIS

A demonstration of collectability here--whether Cheng was able to pay some or all of the judgment--required the Wises to introduce admissible evidence (rather than speculation or assumptions) as to " 'the actual circumstances to determine whether the judgment "would have been collectable[]" ' " and "can include information about the basic solvency of the defendant in the underlying case, as shown by [his or her] assets, net worth or available proceeds from investments." (*Hecht, Solberg, Robinson, Goldberg & Bagley LLP v. Superior Court, supra,* 137 Cal.App.4th at p. 591.) It appears the only evidence concerning Cheng's personal net worth, income, or other assets came from the

15

testimonies of Cheng, Grant, and Selik. Grant's asset search revealed Cheng owns no bank accounts in his own name, has "been broke since 1991," and has had no assets since 1991. Cheng's trial testimony, confirming this assessment, also verified he has not filed a personal income tax return in 17 years, and has funded his lifestyle over those years from social security, gifts from his parents, and money invested by third parties in his various corporate entities. The Wises' contrary showing contained no affirmative evidence Cheng has owned any assets in his own name since 1991. On appeal, the Wises argue the testimony of one witness can be substantial evidence and the jury could have "decided that Cheng was lying" when he denied having any assets or any current ability to pay the judgment. "True as that may be, disbelief of [his] testimony does not constitute affirmative evidence of the contrary proposition" (*Viner v. Sweet* (2004) 117 Cal.App.4th 1218, 1229), and hence the determination that Cheng was not credible simply means his testimony has " 'no more effect than if it had not been given. It disappears from the case . . . .' " (*Hicks v. Reis* (1943) 21 Cal.2d 654, 660.)

The Wises rely principally on Selik's testimony that the judgment against Cheng was collectable in the past and would be collectable in the future, to assert there was substantial evidence to support the finding of collectability. We have examined all of the bases on which Selik relied for his opinions and conclude, for the following reasons, his opinion does not provide substantial evidence to support the finding of collectability.

The principal thrust of Selik's testimony regarding past and future collectability was that the Wises could have used "reverse piercing" and obtained funds placed in the corporate entities by third-party investors to satisfy the judgment against Cheng. On

16

appeal, the Wises assert reverse piercing was not the only, or "arguably not even a significant basis," for Selik's opinion. However, the first example they cited on appeal for Selik's "other" bases for his opinion on collectability was Selik's testimony that a creditor can file a motion to amend the judgment to include the corporate entity or file a separate lawsuit. Selik did not state those were *alternatives* to reverse corporate piercing, but instead testified those were the *methods* he would have employed *to effect a reverse corporate piercing*. Moreover, it is irrelevant to our analysis whether reverse piercing was the principal predicate for Selik's opinion, or was merely one of many bases for his opinion, because our evaluation of whether substantial evidence supports the judgment requires an examination of whether he had *some* basis for concluding the judgment would have been collectable.

However, as DLA's appellate brief convincingly argues, the law precludes the Wises from employing "reverse piercing" to obtain funds paid by third party investors into Cheng's corporate entities to satisfy Cheng's personal debts. (*Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162 Cal.App.4th 1510, 1512-1513 ["a third party creditor may not pierce the corporate veil to reach corporate assets to satisfy a shareholder's personal liability"].) Because the Wises provide neither argument nor authority to the contrary, we deem the point conceded. (Cf. *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.) When an expert premises an opinion on the assumption that an incorrect legal theory applies, the opinion is entitled to no weight and cannot constitute substantial evidence. (See, e.g., *Corrales, supra,* 198 Cal.App.4th at p. 226.) To the extent Selik's testimony that the judgment could have been collectable in the past

17

assumed the Wises could have pursued funds placed in the corporate entities by third-party investors, Selik's opinion is premised on an incorrect legal theory that cannot provide substantial evidence to support the finding of collectability.  The Wises provide neither argument nor authority undermining this legal argument and, accordingly, we deem the point conceded.  (Cf. *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)  They appear to argue, however, that DLA's expert testified about the bar against reverse piercing and the jury, as trier of fact, was entitled to weigh the evidence and elect to credit the Wises' expert and discredit DLA's expert.  However, although the jury does decide *factual* issues, the Wises cite nothing to suggest a jury is entitled to credit an erroneous *legal* theory.

Selik's other predicates for his opinion on past collectability fare no better.  He relied, for example, on his speculation that it is "probab[le] that [Cheng] has an ownership interest" in the La Jolla home in which he lived.[4]  However, Selik conceded a creditor cannot levy on rental property, and admitted he had seen neither the deed nor the lease agreement for that property.  The asset search by Grant, which Selik described as "excellent," uncovered the recorded deeds to the property and showed Cheng did *not* hold any ownership interest in that property.  There was apparently no evidence suggesting the recorded owner and lessor was a straw man acting for Cheng.  Selik also relied on his

---

[4]    To the extent Selik's opinion on past collectability assumed Cheng must have had some degree of financial wherewithal in reliance on the fact the rent on the property was $5100 per month, the only evidence on the *source* of funds to pay this rent was that one of the corporate entities used corporate funds (obtained by capital infusions from investors) to pay the rent.

speculation that it is "likely" Cheng had or has money hidden in foreign bank accounts, although Selik candidly admitted that "we have no evidence of that." He also relied on Cheng's claim he donated $1 million to his alma mater of "over the years," but neither independently verified the accuracy of this claim nor (more importantly) could testify to whether any of those donations had been made after the judgment lapsed in 2004. Finally, Selik's opinion on past collectability also appeared to assume that, because Cheng made multiple expensive trips to China over the years, he must have had significant financial resources to afford those trips. However, the only evidence as to the source of funds to pay for these trips was that his corporate entities used corporate funds (obtained by capital infusions from investors) to pay for those trips, and Selik cited no facts suggesting Cheng had personal assets he used for these trips. Because each of these predicates to Selik's opinion relied purely on speculation or assumptions unsupported by the record, Selik's opinion on past collectability (to the extent it was based on the forgoing assumptions and speculations) "cannot rise to the dignity of substantial evidence" and a judgment based solely on that opinion "must be reversed for lack of substantial evidence." (*Pacific Gas, supra,* 189 Cal.App.3d at pp. 1135-1136.)

The only remaining factor cited by Selik in support of his opinion on past collectability was his conclusion that an aggressive collection effort could have included subpoenaing Cheng's investors under third-party judgment debtor examination procedures, and these examinations would have exerted pressure on these investors to

loan Cheng the money to pay the Wises.[5]  This final basis for Selik's opinion as to past

collectability cannot serve as an adequate foundation for his opinion both because it is

rooted in an incorrect legal theory *and* because it rests on speculation or assumptions

unsupported by the record.  The Wises could not have even lawfully obtained a subpoena

requiring investors to appear unless their application for the subpoenas proved to the

court, by affidavit or otherwise, that the specific investor possessed or controlled property

in which Cheng had an interest, or that the specific investor was indebted to Cheng.

(Code Civ. Proc., § 708.120, subd. (a).)  Selik never suggested, much less with any

evidentiary support, that the Wises could have satisfied these legal impediments to

obtaining the subpoenas necessary to begin applying "pressure" on the investors.  Selik,

although admitting the statute contains these limitations on the creditor's ability to obtain

a subpoena, testified judges issue these subpoenas regardless of the statutory

requirements.

We decline to accord testimony any weight when it is premised on the assumption

that the law will not be followed by the courts.  Moreover, even assuming a judge would

have disregarded the law and issued the subpoena, this aspect of the foundational facts

_____

[5]  Selik also testified these examinations could have resulted in payment because Cheng would have been pressured (either by the investors or out of self-interest) to pay the judgment.  In addition to the fallacious legal theory and speculative assumptions fatal to Selik's opinion on "investor loans to pay the judgment" as discussed below, Selik's belief Cheng would have paid the judgment fails for a third reason: it is based on the implicit predicate that Cheng had independent assets to which he would have resorted to respond to this pressure.  Because there was no *evidence* Cheng had any assets to which he could have resorted, Selik's opinion that Cheng would have responded to these examinations by paying the judgment lacks any factual foundation and is therefore entitled to no weight.

20

relied on by Selik to conclude the judgment would have been collected in the past (i.e. from loans by investors to Cheng because the investors "are going to want to protect their investment") is speculative on multiple levels: it assumes the Wises would have discovered the identities of the investors to be subpoenaed before investments dried up as a result of the 2008 stock market crash[6]; more importantly, it required Selik to speculate as to what investors might have done (e.g. loaned money to Cheng personally) under a hypothetical set of historical facts without any evidence that Cheng's investors would have in fact reacted as surmised by Selik. Selik apparently never spoke to any investors to ask whether they would have loaned money to Cheng personally had they learned of his indebtedness to the Wises. Although Jack White (who appears to have been Cheng's largest investor) was a witness at trial, the Wises never asked him whether he would have loaned money to Cheng personally had he learned of Cheng's indebtedness to them.

Because all of the predicates for Selik's opinion on past collectability rely on speculation, factual assumptions unsupported by the record, or fallacious legal assumptions, his opinion "cannot rise to the dignity of substantial evidence" and a judgment based solely on his opinion "must be reversed for lack of substantial evidence." (*Pacific Gas, supra,* 189 Cal.App.3d at pp. 1135-1136.)

---

6    Cheng testified that, after the stock market crash of 2008, he had difficulty raising money from investors. There was no evidence, had the judgment been renewed, the Wises would have learned the identities of the investors any earlier than they *actually* did (i.e. in 2009), well after the crash.

21

The Wises also rely on Selik's testimony that the judgment would have been collectable in the future to assert there was substantial evidence to support the finding of collectability. However, Selik's opinion on "future collectability," premised on his prediction that Cheng would continue to convince investors to invest in his business schemes, explained that (1) if Cheng succeeded in getting new investors and the business became successful "we might have something in the . . . millions and millions and millions to go after," and (2) even if the businesses continued to fail "it's probably just a few million dollars in investments that we will be going after." The latter basis for Selik's opinion on future collectability merely restates his "reverse piercing" theory and we conclude, for the reasons already discussed, it is entitled to no weight and cannot constitute substantial evidence. (*Corrales, supra,* 198 Cal.App.4th at p. 226.) We conclude, for distinct reasons, the former basis for Selik's opinion on future collectability is also entitled to no weight and cannot constitute substantial evidence to support the finding of collectability. The trial evidence showed none of the companies have any existing contracts or agreements, none of the companies have any assets, and the companies were "dead" without an infusion of new investment funds, which (Cheng conceded) had largely dried up. Selik's prediction of "millions and millions and millions [for the Wises] to go after," notwithstanding the absence of capital and Cheng's historical record of failed enterprises, is entirely speculative.

In *Sargon Enterprises Inc. v. University of Southern California, supra,* 55 Cal.4th 747, our Supreme Court recently cautioned against admitting such expert testimony predicting the amount of lost profits for a start-up business, reasoning that:

22

"World history is replete with fascinating 'what ifs.' What if Alexander the Great had been killed early in his career at the Battle of the Granicus River, as he nearly was? What if the Saxon King Harold had prevailed at Hastings, and William, later called the Conqueror, had died in that battle rather than Harold? . . . Many serious, and not-so-serious, historians have enjoyed speculating about these what ifs. But few, if any, claim they are considering what *would* have happened rather than what *might* have happened. Because it is inherently difficult to accurately predict the future or to accurately reconstruct a counterfactual past, it is appropriate that trial courts vigilantly exercise their gatekeeping function when deciding whether to admit testimony that purports to prove such claims. [¶] An accountant might be able to determine with reasonable precision what [plaintiff's] profits would have been *if* it had achieved a [certain] market share . . . . The problem here, however, is that the expert's testimony provided no logical basis to infer that [plaintiffs] *would* have achieved that market share." (*Id*. at p. 781.)

Similarly, in *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739 (*Greenwich*), the court rejected an award of damages based on an expert's projection of lost profits because the claimed lost profits were "uncertain, hypothetical and entirely speculative." (*Id*. at p. 743.) There, the plaintiffs sought lost profits for breach of a real property sales agreement, and "presented evidence of lost profits through the testimony of [a] real estate appraiser," who testified about what the property would have been worth had it been developed according to the intended plans and specifications. (*Id*. at p. 749.) On appeal, the court found the resulting award of $600,000 in lost profits was without substantial evidentiary support because the "occurrence and extent of the projected lost profits were not proven with the requisite *reasonable certainty* in this case." (*Id*. at p. 760.) The court noted that, "The evidence in this case was insufficient to show that [either plaintiff] *was an established business or had a track record of successfully*

23

*developing or redeveloping properties. . . .* [¶] . . . The existence of plans for a development does not supply substantial evidence that the development is reasonably certain to be built, much less that it is reasonably certain to produce profits."  (*Id.* at p. 763, italics added.)

In reversing the award, the court stated that "[t]he lost profits claim was based on the assumption that [plaintiffs] would have constructed the residence according to the plans and specifications without changes and that the venture would have been profitable. These assumptions were inherently uncertain, contingent, unforeseeable and speculative. The proposed real estate development project here involved numerous variables that made any calculation of lost profits inherently uncertain."  (*Greenwich, supra,* 190 Cal.App.4th at p. 766, fn. omitted.)  Other cases are in accord.  (See, e.g., *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 877-878 [finding expert testimony insufficient to demonstrate lost profits where a small toy store claimed flood damage to the store caused by defendant led to $50 million in lost profits because plaintiff's new website would have allowed it to compete in the Internet toy marketing business]; *Vestar Development II, LLC v. General Dynamics Corp.* (9th Cir. 2001) 249 F.3d 958, 962 [applying California law and holding too speculative award of lost profits for breach of agreement to negotiate where plaintiff sought "future profits that it hoped to earn from the shopping center it had planned to build on the parcel it was attempting to buy"].)

Selik's opinion that the Wises could collect their judgment in the future likewise rested on the hope that, notwithstanding Cheng's track record over the preceding two decades, one or more of Cheng's entities would earn future profits in an undeveloped

24

business for which no capital had yet materialized.  Selik's opinion is based on projections so "uncertain, hypothetical and entirely speculative" (*Greenwich, supra,* 190 Cal.App.4th at p. 743) that it cannot provide substantial evidence to support the judgment.

We conclude there was no substantial evidence introduced by the Wises to support a finding that the judgment against Cheng would have been collectable, either in the past or in the future, had it been renewed.  Accordingly, we reverse the judgment against DLA, and direct that judgment be entered in its favor.  (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 919.)

## DISPOSITION

The judgment is reversed.  DLA is entitled to costs on appeal.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

McINTYRE, J.

25