Filed 4/29/26  P. v. Brownlee CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARY BROWNLEE,<br><br>    Defendant and Appellant. | B343179<br><br>(Los Angeles County<br>Super. Ct. No. 24VWCF01014) |

APPEAL from an order of the Superior Court of Los Angeles County, Gregory A. Dohi, Judge.  Reversed.

Sharon Fleming, by appointment of the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

The prosecution charged appellant Mary Brownlee with possession for sale of a large quantity of fentanyl and methamphetamine. She requested the trial court permit her to participate in pretrial diversion under Penal Code section 1001.36[1]—that is, " 'the postponement of prosecution . . . to allow [her] to undergo mental health treatment' " for a "qualifying mental disorder." (*People v. Frahs* (2020) 9 Cal.5th 618, 626, quoting § 1001.36, subd. (c).) The court found her unsuitable for diversion, citing an "unreasonable risk of danger to public safety." (§ 1001.36, subd. (c)(4).) On appeal, Brownlee contends the court abused its discretion in declining her request. We agree.

Section 1001.36 narrowly defines an " 'unreasonable risk of danger to public safety' " as requiring an "unreasonable risk" that the defendant will commit one of several statutorily enumerated violent felonies colloquially known as " ' "super strikes." ' " (*People v. Moine* (2021) 62 Cal.App.5th 440, 449 (*Moine*); § 1001.36, subd. (c)(4).) In concluding Brownlee posed such a danger, the court found she was likely to continue selling fentanyl, that the fentanyl she sold was likely to kill someone, and that Brownlee could be prosecuted for such a death on a theory of implied malice murder. According to the court, this established an unreasonable risk that Brownlee would commit a super strike—murder—and the court denied diversion.

The court's reasoning rests on purely speculative factual findings unsupported by any evidence. Accordingly, the court abused its discretion in denying diversion on this basis. The court did not cite any other basis for denying diversion, nor do the People

---

[1] All further statutory references are to the Penal Code.

cite an alternative basis for affirming the court's order. Accordingly, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Charged Offenses and Criminal History

During a May 1, 2024 warrant-based search of Brownlee's residence, police found approximately 2.9 pounds of what appeared to be fentanyl, approximately .9 pounds of what appeared to be methamphetamine, and $6,629 in cash. Brownlee told the police she had been selling fentanyl, and that she started selling drugs over 40 years ago.

On November 22, 2024, the district attorney charged Brownlee with possession of fentanyl for sale and possession of methamphetamine for sale, in violation of Health and Safety Code sections 11351 and 11378, respectively. The criminal information also included allegations based on Brownlee's lengthy criminal history. Brownlee has 20 prior felony convictions spanning 36 years, primarily for drug-related offenses (possession, possession with the intent to sell, and transportation for sale of controlled substances). None involved violence.[2] Nor does Brownlee's misdemeanor record reflect any violence.

### B. Brownlee's Voluntary Substance Abuse Treatment Efforts

Brownlee was released from custody after her arrest. On July 23, 2024—almost four months before the district attorney filed a criminal information charging her—she voluntarily began

---

[2] The remaining felonies were nonviolent property offenses, such as theft, possession of stolen property, and a section 470, subdivision (d) conviction for possessing false identification.

3

a chemical dependency rehabilitation program at an organization called CRI-Help. Upon completing the detoxification portion of the program, she transferred to CRI-Help's community-based residential rehabilitation program. Care providers prescribed Brownlee various medications, including Tegretol for mood instability and Suboxone, a medication to assist in maintaining sobriety from opioids. In October 2024, Brownlee completed CRI-Help's residential program and enrolled in I-ADARP, an outpatient drug and alcohol treatment program affiliated with CRI-Help.

### C.    Brownlee's Section 1001.36 Diversion Request

#### 1.    *Section 1001.36*

The primary goal of section 1001.36 is to "[i]ncrease diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety." (§ 1001.35, subd. (a).) "[A]dvances in psychology and neuroscience" inform this goal. (*Sarmiento v. Superior Ct.* (2024) 98 Cal.App.5th 882, 898 (*Sarmiento*).) "[T]he Legislature has made it abundantly clear that for defendants whose criminal behavior is a function of their diagnosed mental health disorders, treatment is the much preferred option . . . . [Citation.] . . . The Legislature has determined that in most cases, the community will be safer if defendants . . . [whose mental illness contributes to their criminal activity] receive mental health treatment so that they will pose fewer risks to the community both now and in the future." (*Ibid.*)

A defendant must be both "eligible" and "suitable" to be granted diversion. (§ 1001.36, subds. (a) & (b).) Under section 1001.36, a defendant is "eligible" if (1) the defendant

suffers from a qualifying mental disorder, and (2) the disorder played a significant role in the commission of the charged offense. (§ 1001.36, subd. (b)(1) & (2).)  Even if eligible, a defendant is "suitable" for diversion only if the defendant also establishes all the following:  (1) The defendant's "symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment" (§ 1001.36, subd. (c)(1)); (2) The defendant consents to diversion and waives his or her right to a speedy trial (§ 1001.36, subd. (c)(2)); (3) The defendant agrees to comply with treatment (§ 1001.36, subd. (c)(3)); and (4) The defendant " 'will not pose an unreasonable risk of danger to public safety, as defined in [section] 1170.18' "—meaning a risk that the defendant will commit one of several statutorily enumerated violent felonies (" " 'super strikes" ' ") (*Moine*, supra, 62 Cal.App.5th at p. 449)— "if treated in the community" (§ 1001.36, subd. (c)(4)).

A hearing on eligibility and suitability for diversion "shall be informal and may proceed on offers of proof, reliable hearsay, and argument of counsel."  (§ 1001.36, subd. (e).)  "The court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate."  (§ 1001.36, subd. (c)(4).)

### 2. *Request and Supporting Materials*

On November 18, 2024, Brownlee filed a request for section 1001.36 diversion, attaching an evaluation of psychiatrist Dr. Sanjay M. Sahgal (the Sahgal report) and letters of support from individuals involved in her substance abuse treatment efforts.

### a. *The Sahgal report*

Sahgal reviewed Brownlee's criminal record and documents related to the current charges. He also conducted a formal interview of Brownlee, during which she shared her decades-long history of drug use and abusive relationships. Brownlee began using various drugs at the age of 14 after her mother abandoned her and placed her in the care of a physically abusive uncle. At age 18, she married a man who used illegal drugs and physically abused her. They divorced eight years later. While in prison in her early 20's, Brownlee suffered additional abuse and continued her drug use. She reported that she received drugs from a correctional officer who sexually abused her. Brownlee openly admitted that she had been selling drugs her entire adult life because it is " 'all [she] knew or know[s] how to do' " to support herself and her addiction, aside from prostitution and petty theft. "Brownlee was quick to spontaneously state that she accepts responsibility for her behaviors."

Sahgal opined that Brownlee met the diagnostic criteria for opioid use disorder and methamphetamine use disorder. He described "[t]he entire arc of her life from the age of 14 to her current age of 61 [as] a long series of convictions for the consequences and demands of her opioid addiction and methamphetamine addiction." Sahgal further opined that Brownlee's substance abuse disorders were "significant contributing factors to her behaviors associated with the charged offenses," "if not the sole contributing factor." He described her entire criminal history as deriving from her chemical dependence disorders and efforts to financially support them.

According to the Sahgal report, "clinical data suggest that participation in a formal residential chemical dependency

6

rehabilitation program would provide . . . Brownlee with a high probability of achieving longstanding voluntary sustained sobriety." Such programs "very often lead[ ] to sustained voluntary sobriety," and "older patients [like Brownlee] . . . have a higher chance of achieving lasting sobriety. The progress Brownlee had made in her substance abuse treatment efforts since August 2024 provided additional support for Sahgal's opinion that her disorders will respond to treatment. At the time of Sahgal's interview (September 2024), Brownlee was still in the I-ADARP program and "participat[ing] in consistent daily 12-Step meetings for relapse prevention support. Her compliance and adherence to the strict treatment requirements at CRI-Help have been met without deviation. She states that she [feels] a sense of peace for the first time in her life" while participating in these programs. Brownlee told Sahgal, " 'I'm 61 and I just want to be sober and have some sort of life or quality of life.' "

Finally, Sahgal opined that, if Brownlee "were to be placed in a community residential treatment rehabilitation program such as CRI-Help or another similar program, the data suggest that she would be a very low risk to public safety. She has no history of known violence and has indeed been participating in such a program through CRI-Help for four months without any erratic or violent behaviors. Instead, she has been a model patient who has experienced significant benefits from the treatment offered at CRI-Help and through the Baird Street Clinic [of I-ADARP]."

> b. *Letters regarding substance abuse treatment efforts*

November 2024 letters from CRI-Help, I-ADARP, and Brownlee's sponsor all attest to Brownlee's strict compliance

with the requirements of her substance abuse treatment programs and the progress she was making. According to these letters, Brownlee began regular drug testing around August 22, 2024 and consistently tested negative for all substances. Brownlee was participating in mental health treatment as part of her efforts to remain sober. All three letters spoke in glowing terms of Brownlee's efforts in treatment.

At the hearing on the request, Brownlee supplemented her request with letters from additional service providers. A November 15, 2024 letter from the Center for Living and Learning (CLL), an organization that assists previously incarcerated individuals find employment, housing and other services, reports that Brownlee was "actively looking for employment and working closely with [CLL] case managers." A November 15, 2024 letter from Care First Community Investment describes a "[r]eentry program" in which Brownlee was enrolled that "assist[s] participants to effectively engage with community-based health, behavioral health, and social service providers as they return to the community."

### 3. *Hearing and Ruling*

On December 2, 2024, the court held a hearing on Brownlee's diversion request. A criminal justice liaison from CRI-Help appeared to "support" Brownlee and informed the court that Brownlee was still participating and doing "very well" in the independent outpatient program. Brownlee had also found employment. The court acknowledged Brownlee's progress, including that she had been sober for over 100 days.

The court expressed concern, however, that the charged offenses "involve[d] the sale of a really, really deadly substance, fentanyl," "something that kills people . . . has killed people

8

[the court] know[s]," and that Brownlee was in possession of "a lot of it." The district attorney opposed diversion based on similar concerns. He cited the "particular dangerousness with fentanyl" and noted Brownlee had been in possession of a quantity that "could wipe out a city."

The court denied the diversion request on the basis that Brownlee "pose[d] an unreasonable risk [to] public safety." The court explained: "[E]specially given [her] history, if she were to sell fentanyl and someone were to wind up getting killed she would be charged with murder," which "would constitute a super[ ]strike."

The court noted that "if [Brownlee] were to plead no contest . . . as to everything, I would place her on probation." After a brief recess, Brownlee pleaded no contest to both charges, and the court placed her on formal probation for two years. The probation had numerous conditions, including that Brownlee do "outpatient treatment at the direction of [I-ADARP] and CLL." The court noted Brownlee was already involved in these programs and had completed the residential rehabilitation component, hence the court was not also requiring that. The court ordered Brownlee to return to court in two months so the court could "see how [she is] doing."

Brownlee timely appealed the order denying her diversion request.

## DISCUSSION

We review a trial court's decision on whether to grant section 1001.36 diversion for abuse of discretion. (*Moine, supra,* 62 Cal.App.5th at p. 448.) In this context, a court abuses its discretion when it "appl[ies] the wrong legal standard [citation] . . . or bases its decision on express or implied factual

9

findings that are not supported by substantial evidence." (*Id.* at p. 449.)

Here, the court did not question that Brownlee was eligible for diversion. Rather, the court denied diversion based entirely on its assessment that she poses a risk to public safety sufficient to render her unsuitable under section 1001.36, subdivision (c)(4). Unsuitability on this basis requires—without exception—"[a] likelihood the defendant will commit [one of] a limited subset of violent felonies." (*Moine, supra,* 62 Cal.App.5th at p. 450; see *Sarmiento, supra,* 98 Cal.App.5th at p. 896.) The court concluded such a likelihood existed based on the following factual findings: (1) Brownlee was likely to sell fentanyl again, (2) if Brownlee sells fentanyl, it is likely use thereof will result in the death of a third party, and (3) a factfinder could conclude that, in selling that fentanyl, Brownlee acted with implied malice sufficient to support a murder conviction. (See *People v. Watson* (1981) 30 Cal.3d 290, 300 ["malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life"].) All three of these findings are necessary to the court's public safety analysis. As we explain below, however, substantial evidence does not support two of them. Therefore, we reverse.[3]

Brownlee's criminal record provides substantial evidence supporting the first finding—that it is likely she will sell fentanyl again. But evidentiary support for the court's public

---

[3] We thus need not consider whether, if the evidence did support these factual findings, they would establish the type and/or level of risk section 1001.36, subdivision (c)(4) requires to deny diversion.

safety analysis ends there.  As to the second finding, the record contains no evidence on the likelihood that a given dose of fentanyl will prove fatal.  The evidence thus does not support an "unreasonable risk" that one of the doses Brownlee might sell will prove fatal.  As to the third finding, the record contains no evidence bearing on the likelihood a jury would find Brownlee guilty of murder in the court's hypothetical scenario.  And it is unclear what type of evidence *could* support a finding that this is so likely as to pose the requisite "unreasonable risk."  In theory, if permitted to participate in diversion, Brownlee could possibly sell fentanyl causing someone's death, which could possibly result in a murder conviction.  But this is wholly speculative, and " 'speculation is not evidence, less still substantial evidence.' " (*Wise v. DLA Piper LLP* (2013) 220 Cal.App.4th 1180, 1188; *People v. Ramon* (2009) 175 Cal.App.4th 843, 851.)  Indeed, the court's findings boil down to " 'what if' surmises" that "are doubly speculative, because [they] . . . speculate both" that the fentanyl Brownlee sells could prove fatal, and, building on that hypothetical, "how others would have reacted to" it—namely, that a jury would convict her of murder.  (*Wise v. DLA Piper LLP, supra*, at p. 1188, italics omitted.)

Nothing else in the record suggests an unreasonable risk that Brownlee will commit a super strike.  Indeed, nothing in the record supports a risk that she will engage in any violent conduct whatsoever.  To the contrary, Brownlee has no history of violence, there is no violence involved in the offense currently charged, and the Sahgal report opines she does not present a threat of violence. The record does not support that Brownlee is unsuitable due to public safety concerns under section 1001.36, subdivision (c)(4).

After receiving a diversion request, "[t]he trial court's role is to determine whether a narrow range of factors warrant" denial of diversion, bearing in mind the "Legislature['s] . . . determin[ation] that in most cases, the community will be safer if defendants" "whose criminal behavior is a function of their diagnosed mental health disorders" "receive mental health treatment so that they will pose fewer risks to the community both now and in the future." (*Sarmiento, supra*, 98 Cal.App.5th at p. 898.) The public safety factor is the only factor the court identified in denying Brownlee's diversion request, and the only basis for affirmance the People argue on appeal. Because substantial evidence does not support that this factor rendered Brownlee unsuitable, the court abused its discretion in denying her diversion request.

## DISPOSITION

We reverse the court's order denying Brownlee's request for section 1001.36 pretrial diversion. We direct the court, following remand, to enter a new order vacating Brownlee's plea and sentencing and granting her request.

<u>NOT TO BE PUBLISHED</u>.


                                    ROTHSCHILD, P. J.
We concur:



BENDIX, J.



M. KIM, J.

13