Filed 8/31/22  P. v. Carder CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079073 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. MH110799) |
| ALBERT RAYMOND CARDER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Jay M. Bloom, Judge.  Reversed.

Katherine Braner, Chief Deputy Public Defender, and Kristen Santerre Haden, Deputy Public Defender, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Eric A. Swenson, Marvin E. Mizell and Anthony DaSilva, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Albert Raymond Carder was convicted in separate cases of molesting eight young girls in the 1980s. After completing a lengthy prison term, he admitted to being a sexually violent predator (SVP) under the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.) and was committed to Coalinga State Hospital (Coalinga).[1] Five years into his treatment, Carder petitioned to be conditionally released to the CONREP program run by the state's private contractor, Liberty Healthcare (Liberty). The State Department of State Hospitals (DSH) supported that move, so the People bore the burden to prove by a preponderance of the evidence that conditional release was inappropriate because Carder was likely to reoffend in outpatient care. (§ 6608, subds. (g), (k).) During a two day evidentiary hearing, three experts acknowledged that Carder could not be cured of his pedophilia and would remain predisposed to commit sex crimes. Nevertheless, all believed that Carder could safely be treated at CONREP. Although Carder could not change his past, he had developed insight into the reasons for his past behavior and made significant progress in addressing his dynamic risk factors and creating detailed release plans. The experts felt that Carder had developed the ability to self-regulate and avoid reoffending while under community supervision. Various assessments would monitor his treatment progress, while a GPS ankle monitor and strict security protocols would restrict his movement and interactions to safeguard the community.

Despite this evidentiary record, the trial court denied Carder's petition for conditional release, concluding the experts had "downplayed the danger petitioner represents to the public," and additional time was needed to confirm his treatment progress given his "extensive and serious criminal

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

record." The court rejected Carder's comparison to *People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508 (*Rasmuson*), reasoning that while in that case there was "not a scintilla of evidence the petitioner would reoffend," the experts here cautioned about Carder's dangerousness even as they recommended his release.

Carder appeals the order denying his petition for conditional release. As we explain, despite minor factual differences this case is substantively analogous to *Rasmuson* and requires reversal for similar reasons. Applying an incorrect legal standard, the court focused on the *possibility* of reoffense and weighed Carder's treatment progress against his criminal record. While the court was correct that each of the experts said Carder would remain predisposed to sex crimes given his mental disorder, there was similar evidence in *Rasmuson*. And as in *Rasmuson*, the same experts who said Carder could never be "cured" also agreed he was not likely to reoffend if placed under strict supervision in CONREP. The People presented no contrary evidence on that dispositive issue, and they bore the burden of proof. Although the trial court remained free to disregard the experts' conclusions for nonarbitrary reasons, there was insufficient evidence from which it could find by a preponderance of the evidence that Carder was *likely to reoffend* if placed in community supervision. For these reasons, the order must be reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

Carder committed a series of sex crimes in the late 1980s and served a lengthy prison sentence. At the end of his term, he agreed to commitment as an SVP and petitioned five years later for conditional release. The trial court held a two day evidentiary hearing and ultimately denied his petition.

3

A.    *Criminal Background and SVP Commitment*

In his early twenties, Carder molested eight young girls and was convicted in separate cases of six lewd and lascivious acts (Pen. Code, § 288, subd. (a)), and two forcible lewd acts (*id.*, subd. (b)).[2]  Carder first fondled two girls ages 6 and 10 in 1988—daughters of people he knew.  Convicted of one lewd act –and placed on probation, Carder then fondled four girls ranging in age between 7 and 13 in 1989, for which he was sentenced to 17 years in prison.  While serving that sentence, he was charged and convicted with two separate abductions occurring a week apart in 1989.  In one, Carder abducted a 4-year-old girl from her bedroom window early one morning and digitally penetrated her in his car.  In another, he abducted an 8-year-old from her bedroom window and drove her around the corner where he raped and sodomized her.  Carder knew most victims' parents and had taken advantage of his relationship with the families to access their children.  He gravitated toward children because he felt intimidated by women his own age.

Carder was incarcerated for over 25 years in state prison for these crimes.  In 2014, the San Diego County District Attorney petitioned for his commitment under the SVPA.  Carder waived his right to trial and admitted he was an SVP.  He was committed to Coalinga in December 2014 and enrolled in the four-step sex offender treatment program.[3]

---

[2]    The parties stipulated that the court could consider hearsay evidence contained in two expert reports admitted at trial.  The facts underlying Carder's convictions are drawn from those reports.

[3]    As explained at trial, the sex offender treatment program at Coalinga consists of four separate modules.  Module I (Treatment Engagement) orients committed SVPs to the program, providing an overview of treatment steps and the assessments used, and introducing the concept of dynamic risk factors, which the program aimed to address.  Module II (Self-Regulation/Better Life) requires patients to do in-depth work to address the

B.  *Treatment and Petition for Conditional Release*

Five years into his treatment at Coalinga, Carder filed a petition for conditional release in January 2020.  (§ 6608.)  He stated in his petition that the staff psychologist who wrote his last annual review report in October 2019 believed he could be safely treated in the community through conditional release.

At the time he petitioned, Carder was still in module III.  He was denied advancement to module IV in February 2020.  Although very disappointed, Carder worked on the recommendations made by the review panel over the next six months.[4]  He advanced to module IV on August 5, 2020.  Just two weeks later, he was deemed ready for conditional release by DSH and CONREP evaluators.

---

emotions, behaviors, and thoughts that led to offending.  Module III (Treatment Integration and Community Preparation) refines skills learned in module II; patients role-play scenarios they might face in the community and think about how to deal with their dynamic risk factors.  Module IV is the final stage of the program, where patients work to maintain their awareness of their risk factors and refine their skills by mimicking real-world situations.  Module IV can be completed at the hospital or potentially in outpatient care on conditional release.

[4]     As Carder would tell examiner Dr. Vanessa Leite in July 2020, he felt flustered and anxious during his February review when he was asked "tough" questions about his intimacy with women by female examiners.  In subsequent months, "he made a diligent effort to address this aspect of his interactions with females by journaling and considering his perspective on roles of men and women in relationships."  Carder worked to understand his feelings of anxiety about forming healthy intimate relationships with adult females.  He also worked to develop a reentry plan, a 30 day community transition plan, and a relapse prevention plan.  Carder viewed CONREP as critical to his transition into the community, given that he had spent more than half his life in custody.  By July 2020, he had developed emotional awareness and empathy and expressed remorse regarding the violent nature of his sexual offenses.

5

C.    *Trial*

In May 2021, the court held a two day evidentiary hearing on Carder's petition.  Because DSH recommended conditional release in its annual report, the People bore the burden of proof to demonstrate that conditional release would be inappropriate in that Carder would be likely to reoffend. (§ 6608, subds. (g), (k).)  The People called two experts during their case in chief—Dr. Vanessa Leite, a psychologist at Coalinga who concluded in her July 2020 report that Carder was suitable for conditional release, and Dr. Robert Cureton, CONREP's clinical director, who agreed.  Carder called one witness—Dr. Jordan Hopkins, his facilitator for module III, who described his treatment journey and readiness for module IV.

1.    *Dr. Vanessa Leite*

Dr. Vanessa Leite examined Carder in July 2020, shortly before he advanced to module IV.  She had never met him before their interview, and DSH adopted her recommendation for conditional release in submitting its statutorily required annual report.  (See § 6604.9, subd. (a).)  Carder's offenses were more violent and severe than most, which Leite took into account in evaluating community risk.  Abducting strangers from their bedrooms and molesting them certainly posed a greater management risk. Even so, Leite sought to assess Carder's understanding of the dynamic risk factors underlying his offenses and evaluate how he had learned to manage those risks in treatment.[5]  While Carder had reoffended in the past after

---

5    As explained at trial, dynamic risk factors are things a patient can change through treatment.  They capture "the way a person processes relationships, the way they manage their impulse behavior, their general cognitive problem-solving . . . [,] deviant sexual interest, . . . their sexual drive[,] [and] their cooperation with supervision."  Each patient is assessed on admission, and treatment is tailored to that patient's specific dynamic risk factors.  "A person might start with eight dynamic risk factors, and ideally by

6

being apprehended and released on probation, he was using drugs at the time and had no skills in place to self-regulate his behavior.[6]

The People examined Dr. Leite about Carder's assessments at Coalinga. Penile plethysmograph (PPG) assessments are designed to determine sexual arousal when shown visual stimuli.[7] Soon after his commitment, Carder completed a PPG for treatment planning purposes. He was deemed a nonresponder and referred for a validation polygraph and an Abel Assessment for Sexual Interest (AASI-3).[8] The polygraph validation deemed Carder truthful, his AASI-3 scores in 2016 revealed he had "a high sexual interest in white pubescent and adult females" (a nondeviant profile). In 2019, Carder took the PPG test again, yielding no clinically significant results. He was referred for a validation polygraph to confirm the results and was found to be truthful. An AASI-3 test in 2019 revealed (consistent with 2016) that Carder demonstrated a high sexual interest in adolescent and adult female stimuli.

---

the time they get to the final module, the hospital treatment program, they may be down to four active dynamic risk factors."

[6]    By 1989, Carder was using methamphetamine daily. According to Carder, he had not used controlled substances since his incarceration and subsequent commitment at Coalinga. Leite deemed his stimulant use disorder to be mild and in sustained remission at Coalinga.

[7]    As Dr. Cureton would explain in his testimony, the PPG test involves placing a strain gauge around a patient's penis and showing images that could be deviant or normative to see which ones lead to physiological arousal. Although it is possible to fake the test (most commonly by masturbating beforehand), a cardiac measure and follow-up polygraph root out deceptive behavior.

[8]    The AASI-3 test evaluates how a person responds to stimuli that could reflect a deviant sexual interest.

Carder also took polygraph assessments in 2015, 2016, 2017, and 2019. In 2016, Carder admitted having sexual thoughts about children aged 13 to 17, two to three times a month. He was untruthful when asked if he had masturbated to fantasies of a minor in the last month or fantasies of a victim in the last year. And in a follow up exam a month later, he was found untruthful when asked if he was concealing anything about his sexual fantasies in the questionnaire. In 2017, Carder admitted to still having sexual thoughts and fantasies involving minors but was truthful when he denied masturbating to those thoughts or fantasies. He gave the same truthful responses in 2019. He was further truthful in 2019 in stating that he only thought about his victims in the context of treatment when reviewing his offense history.

The last time Carder acted on a deviant thought was 2016. Given his more recent polygraph tests, it did not raise a red flag for Dr. Leite that Carder had masturbated to sexual fantasies involving minors as recently as 2016. When asked by the prosecutor whether it concerned her that Carder continued to be attracted to young girls, Leite said no. It was not uncommon for this attraction to persist. For some, being institutionalized reduced those feelings while for others treatment brought those feelings to the forefront. The important thing was for a patient to demonstrate understanding of the dynamic risk factors associated with offending. This was true even as to a sex offender who had kidnapped children from their bedroom windows to molest them.

Dr. Leite spoke with Carder's module III facilitator to understand why he had not advanced to module IV in February 2020 and what had changed to let him progress six months later. In those months, Carder completed an AASI-3 evaluation and deemed to have a nondeviant profile. He had also

developed release and relapse prevention plans to map out what type of support he would need in the community if he felt triggered. Leite described Carder's plans as "some of the most detailed plans" she had ever seen. Dr. Cureton, who had felt in March 2019 that Carder was not ready for conditional release, had since changed his view. By the time he advanced to module IV at Coalinga, Cureton felt that Carder had increased his insight and understanding of his dynamic risk factors.

Dr. Leite used two tests to evaluate recidivism risk. The STATIC-99R test looked to Carder's criminal history alone, which placed him at average risk for reoffending with a score of two. That meant that he had about the same risk for recidivating as the typical sex offender. Those released to community supervision would have lower risk. Leite acknowledged that Dr. Kelley gave Carder a level 4 (above-average risk) on the STATIC-99R in her 2019 evaluation.[9]

Dr. Leite also used the STABLE-2007 test, which evaluated thirteen dynamic risk factors empirically linked to sexual recidivism. Carder's scores put him at "a moderate level of stable dynamic needs." (Boldface omitted.) In Leite's view, Carder's main remaining risks were his capacity for relationship stability (given that he had never been in a stable live-in

---

[9] Dr. Sharon Kelley, a consulting psychologist at Coalinga, prepared Carder's 2019 annual evaluation report under section 6604.9. Although her report was admitted at trial with the parties stipulating to its admissibility, she did not testify. In 2019, Kelley gave Carder a STATIC-99R score of four based on his prior convictions. But that same report noted Carder's treatment progress and stated that his "current sexual risk would be over-estimated by the Static-99R if used in isolation" because that test "does not incorporate treatment change." Despite evaluating Carder as above-average risk on the STATIC-99R, Kelley recommended conditional release in 2019, when Carder remained in module III.

relationship) and his continued pedophilic disorder which left him predisposed to commit sexual criminal acts. The People questioned Leite's scoring choices as to several of the enumerated dynamic risk factors.[10]

Ultimately, while Dr. Leite did not believe Carder was ready for unconditional release, she believed he should be conditionally released. She credited his advancement to module IV, progress in addressing dynamic risk factors, and detailed release plans. In Leite's view, Carder had essentially done what he could in the hospital setting. He had a stronger understanding of his risk factors compared to 2018 and 2019, advanced farther in his treatment, and developed a much more detailed release plan. Leite believed that CONREP supervision could adequately manage lingering risks stemming from his pedophilia and relationship instability. Polygraph tests would continue to assess his deviant sexual thoughts and fantasies, and Carder would continue to participate in group and individual therapy. The fact that Carder himself sought only supervised release demonstrated his

---

[10] For example, Leite rated Carder a zero (no concern) rather than a one (some concern) or two (great concern) for emotional identification with children despite his statement to Dr. Cureton in past interviews that he felt close and connected to the kids. Leite had concerns about Carder's ability to develop close, intimate relationships with women, and yet rated him zero on hostility toward women and loneliness. She also scored him as zero for impulsive acts, crediting Carder's explanation about the offenses and his lack of impulsive behaviors while institutionalized, and pinning past opportunistic behavior on his substance abuse. As to grievance thinking, Leite rated Carder a zero despite his statement to Cureton that he had intercourse with an eight-year-old because he was mad at the system for viewing his previous sex crimes so harshly. As Leite explained, this statement reflected his *past* thinking, not his current risk.

insight and awareness into his risk factors and was "a big indicator of his progress."[11]

With that, the People concluded their examination of Dr. Leite. Carder's counsel then probed the sex offender treatment program at Coalinga and the nature of Carder's mental disorder. Leite explained that although Carder could never be "cured" of pedophilia, the goal of his treatment was to help ensure that he could self-regulate his behavior to avoid reoffending. The mere fact that Carder was diagnosed with a pedophilic disorder and would always be attracted to children did not mean he was unable to decrease his risk of recidivism. PPG and polygraph assessments at the hospital evaluated whether patients were having sexual thoughts and fantasies and if they were masturbating to them. Treatment helped patients learn how to cognitively process sexual thoughts when they emerged.

Dr. Leite testified that treatment at Coalinga was voluntary, and only a quarter of SVPs agreed to it. Carder stipulated to his commitment and immediately enrolled in the sex offender treatment program on admission to Coalinga in December 2014. Of 50 patients Leite had evaluated over the years, only five met the criteria for conditional release. She would never recommend someone for conditional release if she believed there was a serious or well-founded risk they would reoffend. Leite explained that if Liberty staff had concerns about Carder's performance at CONREP, there were mechanisms to bring him back to the hospital. In short, Leite believed that Carder was not likely to engage in sexually violent criminal behavior

---

[11] As Leite explained in her report, Carder demonstrated "insight into his need for continued treatment under supervised conditions in the community in light of the amount of time he has been incarcerated." She believed based on his treatment progress that "it is reasonable to expect him to voluntarily pursue treatment in the community."

due to his mental disorder if placed under Liberty's supervision and treatment.

Asking a few follow-up questions, the court inquired whether Dr. Leite's recommendation would change if it turned out there were more victims. Leite explained why it would not—Carder could not change his past, and the focus now was whether he could address the issues that led to his behavior. The goal of therapy was not to prevent Carder from having pedophilic thoughts but rather to prevent him from acting on those thoughts.

### 2. *Dr. Robert Cureton*

The People next called Dr. Robert Cureton, the clinical director of CONREP's statewide conditional release program. Cureton coordinates with hospitals to identify individuals suitable for community release and prepares treatment plans for them once they are released. As Carder approached module IV at Coalinga, Cureton prepared a hospital liaison report evaluating his suitability for conditional release. Cureton recommended conditional release on August 31, 2020, even though Carder had just advanced to module IV two weeks before. Carder had made substantial progress since 2019, when Cureton previously opined that he needed additional hospital-based treatment to understand his risk factors and develop community transition plans.

During treatment, Carder admitted to molesting 30 children across 100 incidents. He was untruthful in his 2016 polygraph exam when asked if he was concealing his sexual fantasies in his questionnaire. A key finding from that failed polygraph was that he had one or more instances of masturbating to thoughts of a minor victim. Reflecting on his crimes, Carder admitted in 2019 that his kidnap-rapes occurred because of grievance thinking. Carder was mad at the system for viewing his previous acts of fondling so harshly

12

and decided to commit an offense to justify it. But that grievance thinking was in the past—how he felt at the time he committed the offenses *30 years ago*, rather than how he felt in 2019. Carder also attributed his past conduct to using methamphetamine, which heightened his sexual reactivity.

Overall, Dr. Cureton believed that Carder's willingness to admit past criminality demonstrated his transparency and openness to treatment. With Coalinga shutting down hospital services due to COVID-19, Carder paid for an outside therapist. Over the years, he had "been participating meaningfully in treatment" and was "regarded as an excellent participant in his programming." Whereas before his pedophilia was unregulated, it was now regulated, allowing Carder to be safely treated in the community.

Carder had completed all the treatment he could in a hospital setting. His statements could not be discounted as empty words. Polygraphs showed he was being transparent and was not acting out on fantasies "for a fairly prolonged period of time"; the latest PPG demonstrated no deviant response needing to be addressed. Moreover, Carder had no serious incident reports throughout his time at Coalinga.

Dr. Cureton believed that Carder understood his dynamic risk factors and had regulated them well enough that they could be managed in the community without posing undue risk.[12] He made statements demonstrating empathy, which in combination with his polygraph and PPG results indicated substantial progress. Carder remained a pedophile (as he himself acknowledged). But through treatment and monitoring, he could

---

[12] This was a positive change since February 2020, when the CONREP panel interviewed Carder and concluded he was not ready for conditional release. At that time, the panel felt that Carder's understanding of his dynamic risk factors was not as robust as it needed to be for the panel to feel he would do well in community-based treatment.

self-regulate his emotions, ensuring he did not backslide into grievance-thinking.

Asked why not just wait longer to see if his sexual interest in children subsided, Dr. Cureton remarked that the hospital had a duty to him as a patient to continue his treatment. Treatment required patients to divulge their offense histories, which caused thoughts to resurface. While Carder's sexual thoughts might never subside, the goal was to ensure those thoughts did not turn to fantasies or morph into behavior. Cureton believed that CONREP could safely supervise Carder in the community.

As Dr. Cureton explained, CONREP offered far more intensive treatment than the hospital—more group, individual, and psychiatric treatment, mandatory substance abuse treatment, and more frequent polygraph tests. Even after hospital programs returned to prepandemic levels, CONREP would provide "close to twice as much treatment as the hospital can provide." The treatment would be overlaid with periodic evaluations and assessments of a patient's dynamic risk factors.

CONREP supervises its patients closely to ensure community safety. Patients are placed on an ankle bracelet with severe restrictions on where they can travel, who they can talk to, and steps they need to take to reduce their restrictions. A community safety team would monitor Carder closely, and the program would take immediate steps ranging from more intensive treatment to a petition for rehospitalization if they saw any negative signs. Each month, a community safety team meeting is held with victim advocates, a representative from the district attorney's office and public defender's office, and law enforcement to describe the patient's behavior over the past month. With these measures in place, no participant in the CONREP program had placed hands on a potential victim in the program's entire 18

14

year history.  That reflected the strength of the monitoring system in place and its ability to catch problems early.  All things considered, Dr. Cureton believed Carder was not likely to engage in sexually violent criminal behavior due to a mental disorder if treated and supervised at CONREP.

The court probed CONREP's supervision further, asking a few follow-up questions of Cureton.  In response to the court's questioning, Cureton explained that although Carder's molestation of 30 victims was on the higher end, in the past year CONREP had seen a patient be conditionally released who had molested more than 30 victims.  To the court's suggestion that CONREP did little to monitor movements besides the ankle monitor, Cureton disagreed.  Apart from the GPS monitor, patients have restricted zones of travel and might not be able to leave their homes without a prior written plan.  CONREP conducts covert surveillance of newly released patients and accompanies patients on any forays into the community, especially early in the program.  For much of a patient's first year in conditional release, they would be accompanied by Liberty staff wherever they went.  Only when the team felt it safe would they reduce their supervision with court approval.  At some point, CONREP's goal is to reduce the level of intensive supervision, and that happens "toward the later stages" when patients submit their schedules in advance and the GPS movements and polygraph tests confirm their whereabouts.

The court then asked how it could be that someone could suddenly be cleared for conditional release after a year of treatment following 30 years of suffering from a mental disorder.  Dr. Cureton responded that significant change as a result of this kind of treatment never happens in as little as a year; rather, "the shortest anyone has gone through the hospital-based treatment program has been three and a half years."  He went on to explain

that factors such as aging and intensive treatment could lead to real change. Finally, the court probed the possibility of bias in reports. Cureton replied that independent panels and input from module facilitators themselves mitigated that risk.

### 3. *Dr. Jordan Hopkins*

In his case-in-chief, Carder called Dr. Jordan Hopkins, a staff psychologist at Coalinga who was his program facilitator for module III. Hopkins believed Carder made great strides since entering module III. He was very serious about his treatment, always willing to present on various readings during group meetings and ready to discuss and participate during check-ins. Carder stood out as a model patient—in contrast to those who did not seem to take treatment as seriously, he was transparent even about things he felt uncomfortable sharing in front of a female facilitator.

Given his progress, Dr. Hopkins recommended that Carder advance to module IV in 2019. An independent review panel met in February 2020 but did not pass him.[13] The panel wanted Carder to continue journaling, address his intimacy deficits and hostility toward women, learn DBT (dialectical behavior therapy) coping skills, address his trauma history, and continue participating in assessments required by his facilitator.

The pandemic greatly reduced the number of treatment programs available at Coalinga, but Carder continued his individual treatment with Dr. Hopkins or another cofacilitator at least every other week. Hopkins believed Carder carried out each of the review panel's recommendations. Specifically, he: (1) continued journaling and discussed his entries with

---

[13] Advancement to module IV is not about conditional release, but rather about whether the patient is ready to move to the next phase of treatment at the hospital.

Hopkins; (2) completed an assignment about his past relationships with women and imagined what a future relationship with a woman might look like; (3) completed an assignment identifying times he imposed gender roles or stereotypes on women; (4) completed worksheets relating to specific DBT skills the panel wanted him to address; and (5) paid out of pocket for additional sex offender treatment offered by phone.

With Carder having completed everything in module III, Hopkins had no concerns about him advancing to the next stage. She again referred Carder for advancement to module IV in August 2020. Even if Carder was cleared for conditional release, she noted that finding a placement in the community could take a long time; in this interim period, he would continue to participate in module IV in a hospital setting at Coalinga.

4. *Closing Arguments*

In his closing, the prosecutor highlighted the severity of Carder's crimes, his continuing sexual interest in minors, and the speed at which he was recommended for conditional release after progressing to the fourth and final treatment module. Although all three experts recommended conditional release, "[T]here were some things that the People were not entirely satisfied with, specifically Dr. Leite's assessment on the dynamic risk scale." The People urged the court to consider the questions they raised as to the expert assessments and reach a contrary conclusion that Carder was likely to reoffend if conditionally released.

By contrast, Carder's counsel argued that conditional release was simply the next step in his treatment, and he would remain "very, very highly supervised" at CONREP. It was the People's burden to prove that Carder was likely to reoffend while under community supervision, but they presented no evidence that would support such a finding.

17

The court interjected, asking if it had to follow the doctors' recommendation or if it could instead "balance that against [Carder's] record to determine whether the public would be protected if he is released." Defense counsel pointed the court to *Rasmuson, supra,* 145 Cal.App.4th 1487, which explained at page 1509 that a court may not arbitrarily disregard unanimous and uncontradicted recommendations of medical experts. To the extent the People wanted to cast doubt on the expert recommendations—for example, based on the number of victims Carder had molested—it was incumbent on them to introduce evidence linking that statistic to a likelihood of reoffending. But the record actually showed the opposite—the experts explained that recidivism risk turned more on an SVP's transparency, insight, and dynamic risk factors than on the number of victims. Here the court once again interjected, asking if there would be any number of victims at which the public safety interest would justify diverging from the unanimous expert view. Carder's counsel replied that there would not—and because the People bore the burden of proof, any link between the number of victims and recidivism risk should have been presented at trial.

Ultimately, counsel explained, the People bore the burden to prove by a preponderance of the evidence that there was a serious and well-founded risk of reoffending under community supervision. While the People may have had concerns about the way Dr. Leite scored Carder's dynamic risk factors, the only evidence before the court was that Carder was at average risk of reoffending even if *unconditionally* released. Conditional supervised release was the next logical step in Carder's treatment notwithstanding his very recent promotion to module IV, and CONREP imposed stringent conditions to reduce any risk of reoffending. Ultimately, Carder maintained, to deny his petition would require the court to conclude based on speculation rather than

18

evidence that more victims or insufficient time in module IV increased the risk of recidivism. Absent evidence to the contrary, the court could not find that the People met their burden to prove a serious, well-founded danger that Carder would engage in sexually violent predatory behavior if released to community supervision.

5.    *Order*

The court took the matter under submission. Two days later, it issued an order denying Carder's petition for conditional release. Making minor nonsubstantive changes on June 10, the court entered a corrected order nunc pro tunc to May 7, 2021.

The corrected order began by stating the applicable standard of review: because the hospital's annual report recommended conditional release, the People bore the burden to prove by a preponderance of the evidence that conditional release was not appropriate. As it viewed the parties' positions, "the hospital staff unanimously agreed that petitioner should be on outpatient status" whereas the People maintained that Carder "should not be released given his history of sexual deviance." In the court's view, "the case essentially require[d] a determination whether petitioner's record should outweigh his current treatment improvement and staff recommendation." In balancing these factors, the court concluded that Carder's "commendable" treatment progress did not "outweigh[ ] the violence and terror he has imposed on 30 or more victims."

The court felt that the hospital "downplayed the danger in favor of his successful treatment." As it read the record, "just about every report that recommends release also notes the potential danger from petitioner." In the court's view, because outpatient status had only recently been recommended, "some time should pass to confirm the changes [Carder] has made." While

19

Carder "should not be housed forever if he is in fact not dangerous," the court asserted, "[M]ore time is needed to confirm that the changes he has made are not merely verbal, but real." Although Carder had a low risk of recidivism based on his dynamic risk factors, "there is still a reasonable chance of reoccurrence" and "[i]n the court's view, one victim more is one victim too many."

Turning to the record, the court observed that Carder had failed a polygraph as recently as 2016 and had not utilized all available treatment at the hospital.[14] Reiterating its concern from trial, the court highlighted the uncertainty regarding "how many people petitioner has actually molested." Hospital staff relied on his estimates of 30 [victims] or 100 [incidents], but "there is no way to determine with certainty the real number." Finally, the court raised concern with the level of supervision. Although Liberty's CONREP program would carefully monitor Carder "by ankle bracelet, clandestine observations, and other means," it could not guarantee that Carder would be "guarded 7/24." Despite CONREP's reported recidivism rate of *zero*, patients that violated CONREP rules were brought back to court (suggesting less-than-perfect compliance). In the court's view, Carder presented a major monitoring challenge. And yet, the court mused, Dr. Leite recommended conditional release despite finding that Carder was "likely to

---

[14] This appears to reference Dr. Cureton's statement in his August 2020 hospital liaison report that Carder was enrolled in module II and "[t]here remain a number of recommended treatments he has not yet availed himself to." This information appears to have been dated—by the time Cureton wrote his report, Carder had advanced to module IV. Cureton's report elsewhere highlights that advancement as reflecting Carder's completion of "the formal components of the hospital treatment [p]rogram."

engage in future violent predatory criminal behavior if not detained or treated in a custodial environment."[15]

Ultimately, the court distinguished this case from *Rasmuson, supra,* 145 Cal.App.4th 1487. Whereas that case presented "not a scintilla of evidence the petitioner would reoffend," with none of the experts expressing a concern about his future danger, "[e]ven the experts recommending release caution about [Carder's] future dangerousness," which was buttressed in the court's view "by the fact that no one really knows how many offenses petitioner has perpetrated." The court summed it up this way:

> "As noted above, petitioner has made progress at Coalinga. However, the court feels the hospital has downplayed the danger petitioner represents to the public. Also, he has only been approved for release for a short period of time. More time is needed to confirm this improvement in the face of his extensive and serious criminal record. Therefore, the evidence presented by the state provides more than a preponderance of the evidence that conditional release is not appropriate at this time."

## DISCUSSION

Carder appeals the denial of his petition for conditional release. He claims the court applied the wrong standard in focusing on the mere *possibility* he would reoffend. Given the unanimous view of the three testifying witnesses that he was not likely to reoffend if placed under strict

---

[15] Leite made this assertion based on Carder's diagnosed pedophilic disorder; this was the reason she did not recommend unconditional release. But in the very next line of the concluding paragraph of her report, Leite highlighted Carder's treatment progress and explained that CONREP would provide "supervision that would prevent him from sexually recidivating." This was consistent with Carder's 2019 annual review, where the evaluator believed that he was predisposed to recidivate but *could* safely be treated in the community under conditional release.

supervision at CONREP, he argues that no substantial evidence supports the court's determination to the contrary. We agree and find this case akin to *Rasmuson, supra,* 145 Cal.App.4th 1487, where reversal of an order denying conditional release was likewise compelled.

A.    *Overview of the Sexually Violent Predator Act (§ 6600 et seq.)*

The SVPA authorizes involuntary commitment of those who "have previously been convicted of sexually violent crimes and currently suffer diagnosed mental disorders which make them dangerous in that they are likely to engage in sexually violent criminal behavior." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 902 (*Ghilotti*); see § 6600, subd. (a)(1).) Since its January 1996 effective date (see Stats. 1995, ch. 763, § 3), the SVPA has set forth procedures to screen and evaluate prisoners near the end of their prison terms and commit those found beyond a reasonable doubt to be SVPs. (See generally, *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1143–1148; § 6604.) SVP proceedings are civil in nature (*People v. Yartz* (2005) 37 Cal.4th 529, 536), but individuals are given a statutory right to the assistance of counsel, retention of experts, and access to relevant records and reports (§ 6603, subd. (a)).

Persons adjudicated as SVPs are committed to the custody of DSH for an indeterminate term. (§ 6604; see also § 6606, subd. (a).) At the hospital, they are offered structured sex offender treatment programs. (§ 6606, subd. (c).) Civil commitment of SVPs is deemed nonpunitive because "a person is committed only for as long as he meets the SVP criteria of mental abnormality and dangerousness." (*People v. McKee* (2010) 47 Cal.4th 1172, 1194 (*McKee*).)[16]

16    Prior to the passage of Proposition 83 (Jessica's Law) in 2006, an SVP was entitled to a jury trial every two years at which the prosecution had to

22

"Because the SVPA is designed to ensure a committed person does not remain confined any longer than he or she qualifies as a sexually violent predator, it provides means for that individual to obtain review of his or her mental condition to determine if civil confinement is still necessary." (*People v. Collins* (2003) 110 Cal.App.4th 340, 346; accord *People v. Superior Court* (*Quarles*) (2020) 45 Cal.App.5th 637, 647−648.) Each year, DSH files a report evaluating whether a committed person remains an SVP and if conditional or unconditional release would serve his or her best interests while safeguarding the community. (§ 6604.9.) If an SVP's diagnosis has changed such that "the person is not likely to commit acts of predatory sexual violence while under supervision and treatment in the community," DSH must forward a report recommending conditional release to the county attorney, defense counsel, and the court, which must in turn hold an evidentiary hearing. (§ 6607.)

Regardless of the recommendation made by DSH, an SVP may petition the court for conditional release. (§ 6608, subd. (a).) Provided the petition is not frivolous (*ibid.*), and the person has been committed for at least one year (*id.*, subd. (f)), the court will hold an evidentiary hearing upon receiving a report from DSH. (*Ibid.*) At that hearing, the court must "determine whether the person committed would be a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent

---

prove the person's status as an SVP. Proposition 83 introduced indefinite commitment, and the Supreme Court upheld its constitutionality by looking to the SVPA's due process safeguards such as annual reviews and procedures to petition for release. (*McKee, supra,* 47 Cal.4th at pp. 1188, 1192−1193.)

criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community." (*Id.*, subd. (g).)[17]

Likelihood to reoffend carries a special meaning under the SVPA—it connotes more than the mere possibility, and requires a *substantial danger* or a *serious and well-founded risk* that the SVP will reoffend if placed in the community for continued treatment and supervision. (*Rasmuson, supra,* 145 Cal.App.4th at p. 1507.)[18] Because a person's criminal history "is static and will never change," it "should not be determinative of whether [the committed SVP] is a danger to reoffend," particularly where substantial time has passed since the crimes. (*Id.* at p. 1509.) Likelihood to reoffend " 'does not inevitably flow from one's history of violent sex offenses and a predisposing mental disorder.' " (*Ibid.*, citing *Ghilotti, supra,* 27 Cal.4th at pp. 920−921.)

On appeal, we review the court's factual finding that Carder was likely to reoffend if conditionally released for substantial evidence. (*Rasmuson, supra,* 145 Cal.App.4th at p. 1504.) Viewing the record in the light most favorable to the court's order, we determine whether it contains evidence from which a reasonable trier of fact could find that the patient posed a serious and well-founded risk of reoffending if placed under community

---

17    If the court concludes the person would not be a danger under community supervision, it must order conditional release for one year, retaining jurisdiction over the conditionally released SVP. (§ 6608, subd. (g).) But if the court denies the petition the patient must wait another year to refile for conditional release. (*Id.*, subd. (j).)

18    In articulating this standard for petitions filed under section 6608, the *Rasmuson* court looked to California Supreme Court cases construing the meaning of " 'likely' " in relation to recidivism risk elsewhere in the SVPA. (*Rasmuson, supra,* 145 Cal.App.4th at pp. 1506−1507, citing *Ghilotti, supra,* 27 Cal.4th at p. 922; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 254–255; *People v. Roberge* (2003) 29 Cal.4th 979, 986.)

supervision. (*Id.* at pp. 1507−1508.) Where, as here, all testifying experts unanimously agree that the SVP petitioner is not likely to reoffend under community supervision, the trial court may choose to reject those conclusions, but only for nonarbitrary reasons. (*Id.* at p. 1509, citing *People v. Sword* (1994) 29 Cal.App.4th 614, 629.)

Generally, a patient must prove by a preponderance of the evidence that conditional release would serve his or her best interest and that conditions can be imposed that would adequately protect the community. (§ 6608, subd. (k).) On appeal from the denial of that order, the focus is typically whether the trial court reasonably found that the SVP petitioner did not meet his or her burden of proof. However, where DSH recommends conditional release in its annual report under section 6604.9, the burden shifts. The *state* bears the burden to show "by a preponderance of the evidence, that conditional release is not appropriate." (§ 6608, subd. (k).)[19] In this case, DSH recommended that Carder be conditionally released in its October 2020 annual report filed with the court, which adopted Dr. Leite's recommendations. That shifted the burden to the People to prove by a preponderance of the evidence that Carder presented a serious and well-founded risk of reoffending if conditionally released to CONREP. Therefore, our inquiry is whether the trial court could reasonably find on our record that the People met their burden of proof.

---

[19]    The Legislature introduced this burden-shifting framework in 2013. (Stats. 2013, ch. 182 (Sen. Bill No. 295) § 3.) Previously, the petitioning SVP always bore the burden of proof. (See Stats. 2007, ch. 571 (Assem. Bill No. 1172) § 3; *Rasmuson, supra,* 145 Cal.App.4th at p. 1503 [applying former law].)

B.      People v. Rasmuson *(2006) 145 Cal.App.4th 1487*

Carder describes *Rasmuson* as "eerily similar" to his case. Because we agree the case offers useful parallels, we explore it in detail. Defendant Kenneth Rasmuson was convicted of forcible oral copulation, sodomy, and a lewd act on an 11-year-old boy in 1981. At the time of the offense, Rasmuson was 19. Conditionally released in 1985, he reoffended in 1987, molesting and then abandoning a three-year-old boy in an isolated mountain location. He admitted to molesting numerous other victims in treatment after his commitment. (*Rasmuson, supra,* 145 Cal.App.4th at p. 1491.)

In 2004 at the age of 43, Rasmuson petitioned for conditional release from SVP inpatient treatment under section 6608. The statute at the time placed the burden on him to prove by a preponderance of the evidence that he was not likely to reoffend if placed on community supervision. (See fn. 19, *ante.*) He examined eight expert witnesses involved in his treatment who universally opined that although he was a " 'very serious pedophile' " who "would never be cured" and "faced a lifelong risk of reoffending," he was not likely to reoffend if conditionally released. (*Rasmuson, supra,* 145 Cal.App.4th at p. 1492–1493.) The experts offered different reasons for this conclusion. Among them, Rasmuson had started taking antiandrogen medication; no longer reported deviant sexual fantasies in polygraph and PPG tests; completed four out of five phases of treatment at Atascadero State Hospital; had developed skills to manage his sexual deviancy; and would be closely supervised in CONREP. (*Id.* at pp. 1492–1499.)[20] Although three

---

[20]    Rasmuson's treating psychiatrist highlighted his "dramatic change" since he was taking antiandrogens to reduce his testosterone to castration levels. (*Rasmuson, supra,* 145 Cal.App.4th at p. 1492.) Even so, four of Rasmuson's remaining seven experts testified that he should be conditionally

experts expressed reservations about the nature of Rasmuson's crimes, his ability to manipulate interviewers, his tendency to minimize responsibility and make conflicting statements, and past drug abuse that intensified his aggressive impulses, they felt that CONREP's supervision protocols greatly reduced his danger of reoffending. (*Id.* at pp. 1494, 1495−1496, 1498−1499.) As adduced at trial, CONREP used GPS monitoring, random home visits, searches, polygraphs, PPGs, blood and urine testing, travel restrictions, intensive supervision, and restrictions on where he could go or who he could meet. (*Id.* at pp. 1495−1496.)

To counter this proffer, the People called two additional experts. A senior psychologist at Atascadero questioned the efficacy of antiandrogen medication but conceded he had never treated Rasmuson and had no view as to whether he was ready for conditional release. (*Rasmuson, supra,* 145 Cal.App.4th at pp. 1499−1500.) A Liberty director expressed " 'concerns' " about Rasmuson's release, finding it to be a " 'very close call' " and preferring to see another six to 12 months of stability. (*Id.* at p. 1500.) Nevertheless, that expert conceded that he "would not object to a court-ordered conditional release." (*Ibid.*) During their closing, the People emphasized the heinous nature of Rasmuson's offenses, his past substance abuse, his relatively young age of 43, and his past recidivism after prior release at a time when he was also a " 'model patient.' " (*Ibid.*) Taking the matter under submission, the court issued a one-line order denying the petition on the basis that Rasmuson failed to meet his burden of proof.

Rasmuson appealed, and the appellate court reversed. It noted that Rasmuson presented uncontroverted evidence from eight mental health

released even if he stopped taking medications. (*Id.* at pp. 1492−1493, 1495, 1496, 1498.)

professionals who concluded for various reasons that he "would not be a significant danger to the community if conditionally released and did not present a 'serious and well-founded risk' of reoffending." (*Rasmuson, supra,* 145 Cal.App.4th at p. 1508.) "Against this weighty and impressive evidence, the People failed to present a scintilla of evidence that appellant would likely reoffend." (*Ibid.*) One expert questioned the efficacy of medication without addressing any of the other factors offered by Rasmuson's witnesses. Having never treated Rasmuson, he offered no opinion on his suitability for conditional release. (*Ibid.*) While the other expert expressed reservations and felt the risk of recidivism was a very close call, he would not object if the court ordered Rasmuson conditionally released. (*Id.* at pp. 1508–1509.)

"While the trial court was not required to follow the essentially unanimous and uncontradicted recommendations of appellant's eight expert witnesses," the court explained, "it could not arbitrarily disregard those recommendations. (*Rasmuson, supra,* 145 Cal.App.4th at p. 1509.) The trial court's order gave no indication as to *why* it chose not to accept the opinions of any of Rasmuson's experts. (*Ibid.*) His recidivism within a short period of his previous conditional release, "occurred nearly two decades earlier, before appellant began using antiandrogens and went through the cognitive therapy treatment at Atascadero, which was different and more effective than the treatment he received before his earlier release." (*Ibid.*) The evidence showed that the current conditional release program, CONREP, "provides far greater control, supervision and monitoring than did the prior release program." (*Ibid.*)

Rasmuson's heinous crimes alone could not establish his likelihood to recidivate. As the court explained:

"A person's history should not be determinative of whether he or she is a danger to reoffend . . . . That history is static and will never change. As substantial time has passed, its reliability as a predictor of a defendant's future behavior becomes more equivocal. If such static factors predominated in the assessment of whether an SVP should be given conditional release, a serious offender would never be released regardless of what events subsequent to his offenses revealed, which is contrary to the intent of the SVPA, which allows conditional release even with some risk of reoffending." (*Rasmuson, supra,* 145 Cal.App.4th at p. 1509.)

Based on the evidence presented at trial, the *Rasmuson* court reasoned that denying his petition would be "tantamount to concluding that no SVP who has ever committed a prior serious sexual offense, regardless of how long ago it occurred, can be conditionally released"—a conclusion that "would present serious constitutional issues." (*Ibid.*, citing *Foucha v. Louisiana* (1992) 504 U.S. 71, 77 [when committed persons recover sanity or are no longer dangerous, they constitutionally must be released].)

From *Rasmuson*, we derive two broad principles. First, a court is free to reject the unanimous conclusion of testifying experts that a patient is not likely to reoffend in community supervision, but must do so based on rational findings that are supported by the record. Second, a person's static criminal history cannot by itself determine the likelihood that he or she will reoffend.

C.    Rasmuson *Compels Reversal Here; the Trial Court Applied the Wrong Standard in Denying Carder's Petition for Conditional Release*

The question before the trial court was whether the People met their burden to prove by a preponderance of the evidence that Carder was likely to reoffend if he were subject to supervised conditional release. (§ 6608, subds. (g), (k).) As discussed, "likely" in this context carries a specific meaning—the question was not whether it was *possible* Carder would reoffend but instead

29

whether there was a substantial danger, i.e., a serious and well-founded risk, that he would reoffend if conditionally released to CONREP for continued treatment and supervision. (*Rasmuson, supra,* 145 Cal.App.4th at p. 1507; see also *Ghilotti, supra,* 27 Cal.4th at p. 922 [" 'likely' " as used in a different part of the SVPA "connotes much more than the mere *possibility* that the person will reoffend as a result of a predisposing mental disorder"].) Here, as in *Rasmuson*, the evidence did not support a finding that Carder presented a serious and well-founded risk of reoffending in community supervision.

With the People bearing the burden of proof, both of the experts they called testified unequivocally that Carder was *not* likely to reoffend if conditionally released.[21] As Drs. Leite and Cureton explained, although Carder would probably always have pedophilic thoughts, the focus of treatment was to prevent him from *converting* those thoughts to fantasies or action. Carder had shown substantial progress and had essentially done everything he could do in a hospital setting. He understood his dynamic risk factors; developed a comprehensive release plan; and demonstrated insight and empathy in reflecting on his crimes and those he had hurt. Carder had been transparent with examiners and facilitators and had not acted on a sexually deviant thought since 2016. Whereas before his pedophilia was unregulated, it was now regulated through years of treatment, allowing Carder to be safely treated in the community. The experts credited not only his words but also objective polygraph and PPG results.

Drs. Leite and Cureton further explained why CONREP's supervision could adequately address any community risk. Aside from ankle monitors,

---

[21] Dr. Hopkins, who served as the facilitator for Carder's module III, was only asked whether she had concerns about Carder progressing to module IV. Because she did not work with module IV patients, she expressed no opinion on when those patients could be recommended for conditional release.

Cureton explained that patients have restricted zones of travel and might not be allowed to leave their house except as planned in writing two weeks in advance. CONREP staff conduct covert surveillance and accompany patients into the community for "probably much of the first year" to supervise their interactions. A community safety team monitors patient progress closely and would take immediate steps ranging from more intensive treatment to petitioning for rehospitalization if warning signs emerged. Over time, the level of supervision decreases, but the ankle monitor and polygraph tests ensure that patients are keeping their word.

Never in the program's 18-year history had a participant placed hands on a potential victim, reflecting the significant monitoring in place to catch problems early. Dr. Leite agreed that CONREP supervision would adequately manage any lingering risks stemming from Carder's continued pedophilia and relationship instability. In conjunction with his ongoing therapy at CONREP, polygraph tests, individual and group therapy would monitor Carder's thoughts, fantasies, and actions.

Against this weighty and consistent testimony, the People failed to present any evidence that Carder was likely to reoffend if treated in CONREP's outpatient program. Their approach at trial was to question the experts' conclusions. They highlighted Carder's continuing sexual interest in young girls and the speed at which he progressed from being initially denied advancement to module IV in February 2020 to being advanced in August and recommended for conditional release two weeks later. They further suggested that Dr. Leite failed to adequately evaluate Carder's dynamic risk factors.

Carder responded by establishing through uncontradicted expert testimony that the focus of treatment was not on his thoughts but rather on

his actions.  Dr. Hopkins explained the reasons he failed to advance to module IV in February 2020, and what changed in the next six months to permit him to advance.  Carder's counsel pointed out in closing argument that with the People bearing the burden of proof, it was their responsibility to prove that Carder was likely to offend in community supervision, but no evidence supported that finding.

Given the state of the record, Carder should have prevailed.  There is no reading of the unanimous and uncontradicted evidence from which a court could find that the People met their burden of proof.  Simply questioning the experts' foundational findings, as the People did here, does not establish the converse is true.  (See *Wise v. DLA Piper LLP (US)* (2013) 220 Cal.App.4th 1180, 1192 (*Wise*) [disbelief of a witness's testimony does not constitute affirmative evidence of the contrary proposition]; *People v. Jimenez* (1978) 21 Cal.3d 595, 613 [same]; *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1205 (*Beck*) ["the fact that the trier of fact does not credit a witness's testimony does not entitle it to adopt an opposite version of the facts which otherwise lacks evidentiary support"].)

*Rasmuson* compels our conclusion.  There, all the experts testified that the defendant—who committed heinous sex crimes including *after* his prior conditional release—was not likely to reoffend if placed in CONREP.  The People sought to question those conclusions, examining one expert who debated the efficacy of defendant's antiandrogen medication and another who stated he would prefer to wait longer before for conditional release.  This amounted, in the court's view, to less than "a scintilla of evidence that appellant would likely reoffend."  (*Rasmuson, supra,* 145 Cal.App.4th at p. 1508.)

Although the trial court remained free to reject the experts' conclusions for nonarbitrary reasons, here the People offered and the record contains no *evidence* from which the court could conclude that Carder presented a serious and well-founded risk of reoffending at CONREP. (See *People v. Wright* (2016) 4 Cal.App.5th 537, 546 [findings can rest on reasonable inferences drawn from the evidence but not mere speculation as to probabilities without evidence]; *Leslie G. v. Perry & Assocs.* (1996) 43 Cal.App.4th 472, 483 [inferences must rest on more than mere possibilities].) While the court may have preferred that Carder have more time in module IV while hospitalized, there was no *evidence* from which it could conclude that a short interval between advancement to module IV, and conditional release made it likely that Carder would reoffend at CONREP. Similarly, although the court may have had concerns about Carder's failed polygraph in 2016, the experts did not harbor those same concerns where he had passed all subsequent polygraphs in the four years since. Moreover, even well-founded concern that one or more of the experts failed to adequately consider public safety risks of conditional release would at most give the court a basis to reject those experts' conclusions. It would not amount to proof by a preponderance of the evidence of the contrary proposition that Carder was *likely to reoffend* at CONREP. (See *Wise, supra,* 220 Cal.App.4th at p. 1192 [a determination that a witness is not credible simply means that his or her testimony disappears from the case as if it had not been given]; *Beck, supra,* 44 Cal.App.4th at p. 1205 ["The rejection of a witness's testimony by the trier of fact has only the effect of removing that testimony from the evidentiary mix."].) Ultimately the case for reversal is stronger here than in *Rasmuson* because it was the People who bore the burden of proof, and they offered no

evidence to permit a conclusion that Carder was likely to reoffend if treated under the supervision of CONREP.[22]

Rather than utilize the applicable standard, the court created its own. It viewed the relevant question as whether Carder's treatment progress outweighed his criminal record. It hewed closer to the correct standard at times—stating for example that Carder "should not be housed forever if he is in fact not dangerous"—but repeatedly returned to question of how many victims Carder had molested and expressed the view that "one victim more is one victim too many." Because the court believed there was "a reasonable chance of reoccurrence," it sought additional time to reassure itself of Carder's progress. It emphasized that "just about every report that recommends release also notes the *potential* danger from [Carder]." (Italics added.) Denying conditional release, the court conclusorily reasoned that it was "not appropriate at this time" without explaining what about "this time" would make Carder likely to reoffend.

Instead of focusing on whether Carder posed a serious and well-founded risk of reoffending if placed under CONREP's supervision, the court repeatedly considered whether there was a *reasonable chance of* or *potential*

---

[22] Attempting to distinguish *Rasmuson*, the People note that Carder was not taking medication to reduce his sexual urges, had been convicted of more crimes, and had fewer experts testify that he should be conditionally released. We agree with Carder that "small factual differences . . . do not make the *Rasmuson* case distinguishable in any legally significant way."

34

*for* reoffense.[23]  Nowhere in the court's four-page order was the correct standard discussed or applied.  Several of the factors it cited—uncertainty about the extent of his past crimes, doubt about how Carder would react to young girls in a community setting, and concern about a 2016 failed polygraph—at best alluded to the possibility of recidivism, a circumstance that was accepted by all involved.  No witness suggested at trial that any of these factors made it likely that Carder would reoffend if placed in CONREP's conditional release program.  Although the nature of CONREP's monitoring was plainly relevant to recidivism risk where the experts stopped short of recommending *unconditional* release, there was no evidence permitting the conclusion that despite the monitoring system in place, Carder would be *likely* to reoffend.[24]

Compounding its error in focusing on abstract possibilities of reoffense, the court *weighed* Carder's criminal history against his treatment progress,

---

[23]    The People make the same type of mistake in their respondent's brief, suggesting Carder's past conduct in abducting and raping children established "the potential of how dangerous he could still be to little girls if he was to regress on conditional release."  Although the People and the court were understandably concerned about ensuring the safety of young girls in the community, the question was whether Carder posed a *substantial danger of reoffending in CONREP supervision.*

[24]    The court probed the limits of CONREP's supervision in its questions to Cureton.  But the evidence elicited—that supervision entails ankle monitors, travel restrictions, covert surveillance, chaperoned outings, and community safety team monitoring—at best suggested a possibility that Carder would reoffend with these measures, rather than a well-founded risk.  Cureton explained that the program had not seen a "hands-on victim" in 18 years, reflecting the significant monitoring in place to catch problems early.  With the People providing no contrary evidence, the court acknowledged CONREP's oversight and "zero recidivism rate" but nevertheless worried that Carder could not be "guarded 7/24" and expressed that Carder would "be a major challenge to supervise."

without linking the former to Carder's risk of recidivism. The question was not—as the court put it—"whether petitioner's record should outweigh his current treatment and staff recommendation" or whether his treatment progress "outweighs the violence and terror he has imposed on 30 or more victims." Rather, it was whether the People met their burden to show that Carder presented a substantial danger of reoffending if he were given supervised conditional release.

Naturally, the court was concerned about ensuring community safety given Carder's violent record. There was testimony by Dr. Leite, for example, that the nature of his offenses would be relevant in assessing his recidivism risk. Nevertheless, the only evidence before the court was that Carder was not likely to reoffend in conditional release given his treatment progress and CONREP's monitoring measures. Despite the court's concern about pinpointing the exact number of victims, there was no testimony suggesting that the precise number of victims affects an SVP's likelihood to reoffend. The testimony was in fact the opposite. Leite explained that her recommendation would not change if it turned out there were more victims. Because Carder could not change his past, the focus was on whether he could address the issues that led to his past criminal behavior. Cureton likewise explained that although someone who molested 30 victims might be on the higher end of the scale, CONREP had recently seen someone conditionally released who molested more than 30 victims.

In human behavior, there are few if any ironclad guarantees. Although the trial court clearly would have preferred greater certainty, it strayed from the question at hand in focusing on the *possibility* that Carder could reoffend and in attempting to weigh his criminal history against his treatment progress. Reviewing the unanimous and uncontradicted expert recommendations presented at trial, this case is functionally identical to *Rasmuson*, in which reversal was likewise compelled. Under any reading of the record, the People did not meet their burden to prove by a preponderance of the evidence that Carder presented a serious and well-founded risk of reoffending if conditionally released and provided outpatient care through CONREP.

## DISPOSITION

The order denying Carder's petition for conditional release is reversed, and the superior court is directed to enter a new order granting Carder's petition.


DATO, J.

WE CONCUR:


AARON, Acting P. J.


IRION, J.

37